## KIMBALL APP'T *v.* REDING.

Where money is bequeathed to a trustee, " to be invested and improved accord-
ing to his best skill and judgment," it is his duty to invest it in safe securities,
and his discretion in the selection of investments is not enlarged by the words
" according to his best skill and judgment."

If a trustee's authority enables him to invest in stocks, they should appear to
have been at the time productive, and to have had a market value depending
upon their income, and not upon contingencies.

Shares in a contemplated railroad are not such.

When money is bequeathed to a trustee, to be paid over to the son of the testa-
tor, at such times and in such sums as his interest shall, in the judgment of
the trustee, seem to require, the court will not ordinarily make the trustee an-
swerable for money actually paid over by him in good faith.

APPEAL from a decree of the judge of probate, disallow-
ing certain items in the account exhibited by the appellant,
in behalf of his intestate, Moses Southard.

The cause had been committed to an auditor, with in-
structions to report the facts, from whose report it appeared
that Obadiah Swasey, late of Haverhill, made his will in
due form, which was admitted to probate on the 6th day of
August, 1836, and contained the following item :

" I give and bequeath to Moses Southard, Esq., of Ha-
verhill, aforesaid, the sum of three thousand dollars ; to be
paid over to him by my executors, as soon as they may be
able without injury to my estate, to be held by him in trust
for my son, Benjamin M. Swasey, and his heirs, and to be
invested and improved by him according to his best skill and
judgment, and to be paid over to my son, Benjamin M.
Swasey, at such times and in such sums as he shall judge
for my said son's interest during his natural life, and at his
decease to be paid over to the heirs at law of my said son,
Benjamin M. Swasey."

Moses Southard accepted the trust, and held it till his de-
cease, which happened in March, 1852, after which the ap-
pellee was duly appointed to succeed him therein.

Kimball, the administrator, exhibited in the court of pro-

bate the trustee's account, for settlement; and on the third Tuesday of May, 1853, a decree was passed directing a balance of $5,172,89 to be paid to Reding, the new trustee; from which decree the administrator appealed, because the judge of probate disallowed the three following items in the account:

1. April 1, 1847. Received myself in money,.... $40,00
2. Amount paid for ten shares in stock of the Boston, Concord and Montreal railroad,............1000,00
3. Paid, March 9, 1850, per his receipt, .......... 636,70

The late Obadiah Swasey and Moses Southard lived within about two miles distance, and had been intimate friends fifteen or sixteen years prior to Swasey's death.

Benjamin M. Swasey, the *cestui que trust*, was born about the year 1800 or 1801. His father was of the opinion that he was not capable of managing his property, because he was intemperate in the use of ardent spirits, and of too confiding a disposition. In conversation with Governor Page, who married his wife's sister, the testator, Swasey, not long before his death, appeared in doubt and perplexity as to how he should leave Benjamin's share in his estate. He said, Ben. had been industrious and a good boy, and he wished to do well by him, but he might as well throw it into the river as to leave it at his (the son's) control.

Such, in fact, was the character, and such were the habits of the *cestui que trust*, in regard to intemperance. And so they continued to be, in a greater or less degree, till the time of his departure for California, in March, 1850. During the winter of 1850 his intemperance was greatly increased.

For some months prior to March 12, 1850, B. M. Swasey was very desirous to go to California, and applied to Southard, the trustee, for funds for that purpose, who, however, refused to let him have the funds without the consent of his relatives, and applied to his mother, his two brothers, Samuel and Nathaniel M. Swasey, and to his sisters, Mrs.

Leonard and Mrs. Woods, to learn their wishes. They were all, and his mother in particular, unwilling to let him go to California; and were of the opinion that he would get intoxicated and lose the money if intrusted to him.

Mr. Southard himself stated to Mrs. Woods that it would not be prudent to let Benjamin M. Swasey have the control of the money; and to Samuel Swasey, that he should by no means do it, and that Benjamin was willing that it should be put into the hands of a third person for his use; meaning some one going to California who would take charge of the funds for him.

Benjamin M. Swasey became more than usually intemperate during the winter of 1849–50, and most so a short time before the 12th of March. Finally, upon consulting with Gov. Page, and in pursuance of his advice, Southard, on the 12th of March, paid over to Swasey $500 in gold, and $136,70 for clothes, and some small debts not specified, which he owed; and the latter set out for California. For a short time before he left, he quitted drinking, and was sober till the time he took his departure. He was absent about ten months, was sick a part of the time on his journey both ways and while there, and when he returned. He expended all his money, and was obliged to borrow to enable himself to return. Since his return he has been sober, temperate and industrious.

No evidence was offered as to the particular use he made of the money which was paid over to him.

It also appeared that in 1843 or 1844, books were opened for subscription to the stock of the Boston, Concord and Montreal Railroad, and that many persons in the neighborhood of Mr. Southard, accounted discerning and pruden men, subscribed for stock. Moses Southard himself took ten shares, and on the recommendation of Gov. Page and Samuel Swasey, invested $1000 of the trust money in controversy in the same road.

There were then no railroads in operation in New Hamp-

shire north of Concord. Those that were in operation were understood to be paying good dividends, as were those in Massachusetts. Southard believed that the stock would be a good six per cent. stock, and many others expressed the same belief. He was largely interested in real estate upon or near the line of the contemplated road, and the *cestui que trust* owned no land whatever.

The stock in said railroad is now worthless, or nearly so.

Of the three items of the account in controversy, the first was not supported by any evidence.

*Carpenter*, with whom was *Goodall*, for the appellant.

I. As to the investment in railroad stock.

It appears by the terms of the will that the testator reposed a special and personal confidence in the trustee, and intended to entrust the investment and improvement of the trust fund entirely to his discretion. The words are, " to be invested and improved according to his best skill and judgment." And if the trustee acted *bona fide* without fraud, if he did invest " according to his best skill and judgment," he cannot be liable for any loss. The court can exercise no control over the discretion of the trustee unless he acts *mala fide*. *French* v. *Davidson*, 3 Mad. 396; *Walker* v. *Walker*, 5 Mad. 424; *Forbes* v. *Ross*, 2 Cox 113; Jer. Eq. Jur. 158 and 174; 2 Mad. Ch. 137; *College* v. *Amory*, 9 Pick. 446— (where the words creating the trust are very nearly identical with those used in this case;) *Downer* v. *Downer*, 9 Vt. Rep. 231; *Wormley* v. *Wormley*, 8 Wheat. 431; *S. C.*, 1 Brock. 330.

But even if no special discretionary powers had been conferred upon the trustee, still we say that upon the statement of facts appearing in this case, the investment was not such as would render a mere naked trustee chargeable for any loss arising therefrom.

The general rule is that trustees are not to be held responsible for losses where they have acted *bona fide*, without

fraud and without negligence. " There must be malversation, fraud or negligence to charge a trustee." 1 Story's Eq. Jur. 446, § 465 and note ; 2 Mad. Ch. 134 *et seq.* and 143–4, and note ; Jer. Eq. Jur. 142 *et seq.*; *Paybus* v. *Smith*, 1 Ves. 189 ; *Wilkinson* v. *Stafford*, 1 Ves. 32 and note ; *Routh* v. *Howell*, 3 Ves. 565–6 ; *Churchill* v. *Hobson*, 1 P. W. 243 ; *Brown* v. *Letton*, 1 P. W. 140–1, and numerous other authorities *passim.*

In fact, all the cases in the books upon this subject either directly or explicitly declare, or by imputation recognize this doctrine.

There is no imputation of fraud or of wilful neglect upon the trustee in this case, as we understand, but it is claimed that the investment was so clearly improper and unfit to be made, that it is *per se* conclusive evidence of such negligence as will render the trustee liable for the resulting losses.

What constitutes such negligence in the investment of trust funds as will render the trustee liable for losses is a question upon which there are many conflicting authorities in the English reports. *Palmer* v. *Jones*, 1 Vern. 144 ; *Hardin* v. *Paisons*, 1 Eden 148, cited in Story's Eq. Jur. 516, note ; *Allen* v. *Hanscom*, 7 Brown's Parl. Ca. 375 ; *Caffrey* v. *Darby*, 6 Ves. 488 ; *Trafford* v. *Beohen*, 3 Atk. 439, and cases before cited.

But it seems to be now settled in England that a trustee must invest trust funds in that stock in which the court of chancery is in the habit of directing funds in its own possession to be laid out, and that in case of loss, the mere fact that the trustee did not invest in that fund is, against him, at least *prima facie* evidence of negligence, for which he is responsible. 2 Story's Eq. Jur. 514, § 1273, and cases cited ; *Holland* v. *Hughes*, 16 Ves. 114.

A certain fund (the 3 per cents) being then established by a rule of the court of chancery—equivalent for this purpose to a legislative enactment—is the only fund in which trust property may safely be invested ; it may, perhaps, well

enough be held that if a trustee invests in other stocks it shall be at his peril. Negligence, as against a trustee who invests other where, may, in case of loss, well enough be presumed. He has disregarded a positive, well settled and well known rule of law. But in this country there is no such fund, and no such rule, nor can there be. *College* v. *Amory,* 9 Pick. 446 ; *Smith* v. *Minot,* 20 Pick. 116.

Here " all that can be required of a trustee to invest, is that he shall conduct himself faithfully, and with some discretion. He is to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to a permanent investment of their funds, considering the probable income as well as the probable safety of the capital to be invested." *College* v. *Amory,* 9 Pick. 461 ; *Smith* v. *Minot,* 20 Pick. 116 ; see also *Bryant* v. *Russell,* 23 Pick. 546 ; *Osgood* v. *Franklin,* 2 Johns. Ch. 27 ; *Smith* v. *Smith,* 4 Johns. Ch. 281 and 446.

Railroad stocks may be as fit and proper a fund in which to invest trust property as any other stocks, or real estate— and there is nothing in the nature of these stocks to distinguish them in this respect from any other security for money. They are not necessarily more fluctuating or more unsafe. *College* v. *Amory,* before cited.

Nor can the fact that the particular stock in this case has proved to be worth less than their nominal par value, have any bearing. The question is to be determined upon the state of facts existing at the time the investment was made. These facts, as found by the auditor, show, as it seems to us, conclusively, that the trustee ought not to be charged with the loss.

1. The trustee did not act rashly or inconsiderately, or with an undue confidence in his own judgment. He took advice, and that, too, of men of intelligence, of acknowledged prudence and discretion in the management of their own affairs, and of great sagacity and experience in business generally, in whose judgment, not only from the char-

acter of the men, but from their relationship to the *cestui que trust*—(Gov. Page being the uncle and Samuel Swasey the brother,) and their interest to preserve the property, he might well place the most unlimited confidence. *Vezy* v. *Emory*, 5 Ves. 144; *Thompson* v. *Brown*, 4 Johns. Ch. 628–9.

2. He "observed how men of prudence, discretion and intelligence managed their own affairs, not in regard to speculation, but to a permanent investment of their funds," &c. It appears by the report that very many of the most prudent and careful men in Haverhill at the same time invested their own money in these stocks, not for a speculative purpose, but because they believed it would be a good 6 per cent. paying stock, i. e. a good investment. Many, if not all the persons named in the report are doubtless known to some of the members of the court.

3. The trustee invested of his own money, the same amount, at the same time, in the same stock. He managed the trust fund with the same care and prudence that he did his own money. 2 Story's Eq. Jur. 512, § 1269, and cases there cited; *Osgood* v. *Franklin*, 2 Johns. Ch. 27.

4. Railroad stocks were then universally considered preferable to bank stocks. Banks had not yet recovered from the depression consequent upon the disasters of the preceding years. All the railroads in this State and Massachusetts were then paying good dividends. The Vermont railroads had not been built.

5. The trustee acted in good faith, and "according to his best skill and judgment." The auditor, in substance, so finds. There are no facts found tending to show that he did not; all the facts tend the other way. Besides, the presumption of law is always in favor of a trustee, and negligence or laches must be fully and satisfactorily proved. *Mallabbin* v. *Crowwell*, 7 Gill. & J. 157.

But, as before stated, we understand this point is admitted, or, at least, not contested. It seems to us that this last

named fact ought to be sufficient to discharge him. At any rate, it entitles him to the favor of the court. They will not charge him if it can be avoided. *Thompson* v. *Brown*, 4 Johns. Ch. 629; *Hart* v. *Ten Eyek*, 2 Johns. Ch. 76; *Diffeucluffer* v. *Winclu*, 3 Gill. & J. 341; *Jackson* v. *Jackson*, 3 Atk. 514; 2 Story's Eq. Jur. 511, § 1268.

But even supposing the investment were a breach of trust, the trustee ought not to be charged. The *cestui que trust* had notice of the investment, and acquiesced there-in. During a period of nearly ten years he made no objection or complaint. We contend that it is now too late, and that he is bound by his implied consent. Though the fact does not appear in the report, it appeared in evidence that he gave an actual consent at the time the investment was made, and if deemed material by the court, we ask to have the report recommitted, that the fact may appear. 2 Mad. Ch. 142; 7 Bacon's Abridg. 180; *Trufford* v. *Boehem*, 3 Atk. 444; *Bird* v. *Stokes*, 11 Ves. 319; *Langford* v. *Gascoigne*, 11 Ves. 333; *Parker* v. *White*, 11 Ves. 226.

II. As to the California outfits, so called.

1. Of the whole amount disallowed by the court of probate, $136,70 were paid by the trustee for the clothes, debts, &c., of the *cestui que trust*. That this sum should be allowed there can be no question, and we do not understand that this point is seriously contested.

2. The $500 paid over by the trustee to the *cestui que trust*, to enable him to go to California, must be allowed. By the terms of the will the trust fund was to be paid over to the *cestui que trust*, at such times and in such sums as the trustee should judge for his interest. More appropriate words could hardly be selected to vest the control of the trust fund in this particular entirely and exclusively in the discretion and judgment of the trustee. It is, and from its nature must be, a personal trust; and in the absence of fraud or wilful default on the part of the trustee, the court cannot control or interfere with him in the execution of it.

*Call* v. *Wade*, 16 Ves. 27; *Brown* v. *Higgs*, 4 Ves. 708; *S. C.*, 5 Ves. 495; *French* v. *Davidson*, 3 Mad. 396; *De Manneville*, v. *Crompton*, 1 V. & B. 354; *Forbes* v. *Ross*, 2 Cox 113; *Hibbard* v. *Lambe*, Amb. 309, cited in Jer. Eq. Jur. 174; *White* v. *White*, 1 Bro. C. C. 12; *Wormley* v. *Wormley*, 8 Wheat. 421, 1 Brock. 330; *Downer* v. *Downer*, 9 Vt. Rep. 231.

The facts found by the auditor show that the trustee acted, in this matter, with his usual care and circumspection.

1. He refused to let the *cestui que trust* have the money without the consent of his relations, which consent the importunities of Benjamin undoubtedly procured, though some of them testified that their assent was conditional.

2. He conferred with nearly all the relatives upon the subject. He went to them for the purpose of conferring with them.

3. Governor Page and wife advised him.

4. The result shows that the trustee acted wisely and for the "benefit" of the *cestui que trust*. This is apparent from the facts found in the report, and the opinion of men as prudent and of as sound judgment as any in the State,—Governor Page, Samuel Swasey and John R. Reding, all of whom have a direct interest in the matter.

But the trustee cannot be charged with the $500, even if it were paid over in breach of his trust; for "if the *cestui que trust* has notice of the breach of trust and acquiesces, the trustee is not chargeable. See authorities before cited to the same point.

In this case, the *cestui que trust* not only acquiesced in the application of the money, but urged it,—was himself the principal cause of its being so applied.

*Hibbard,* for the appellee.

I. As to the sum invested in stock of the Boston, Concord and Montreal Railroad.

The provision in the will creating the trust that the estate

should, by the trustee, " be invested and improved, according to his best skill and judgment,", would seem to demand the exercise of the best skill ever required or reasonably capable of being used by a trustee under like circumstances ; what, in law, is called " extraordinary diligence." 1 Bouv. Law. Dict. (under head of " Diligence.") This imposes no wrong or hardship upon the trustee, because he might have declined the trust, and because he acts for compensation.

But had the investment of the funds been left, in terms, to the trustee's discretion, that would not have implied an arbitrary discretion, nor have justified malversation, fraud or negligence. He must exercise, not a wild, but a sound discretion, a discretion regulated by law and under the control of the court. *Erickson* v. *Willard,* 1 N. H. Rep. 217 ; *Rose* v. *Stuyvesant,* 8 Johns. 427 ; *Wilson* v. *Rastall,* 4 D. & E. 757 ; *Webb* v. *Earl of Shaftsbury,* 7 Ves. 480.

In the case last cited, the court held that they could and would control the trustee as to the appointment of new trustees, though that power was expressly given him by the testator " in very large words." *Eldon,* Lord Ch., said " there is no doubt, therefore, of the control of this court over his (the trustee's) discretion. It does not prevent the exercise of his discretion, but takes care that it shall be duly exercised." This is believed to be the rule, both in law and equity, in all cases where discretionary powers are given.

The case of *Downer* v. *Downer,* 9 Vt. Rep. 231, relied upon in the brief of the appellant's counsel, " as directly in point," seems to us to have no application here. That case being upon a trustee's account, came before the superior court of Vermont, by appeal from the court of probate. The court held that, in that State, the court of probate had no jurisdiction over trustees or their accounts, and that as the case came before them by appeal from the court of probate, and as their jurisdiction was only appellate, they could exercise only those powers which belonged to the court of probate ; and, consequently, had no authority to settle or

examine the trustee's account in that form. The proceedings, therefore, were held to be irregular, and the cause was dismissed. It should have been brought in the court of chancery. In this State, on the contrary, the probate court have, by statute, " original jurisdiction in relation to trustees appointed by will, in the cases prescribed by law." Comp. Stat, 393, § 5. No such question, therefore, arises here as in the case of *Downer* v. *Downer*.

We say that, in this act, the trustee did not use ordinary skill and judgment, though required to use the best. The positions assumed by the other side, if they did not exempt him from all control and all responsibility, would require of him no more than that slight diligence, which it is the duty of a mere depositary to use. Story on Bailments 42, 45; 2 Kent's Com. 564.

The stock of the road in which this money was placed, had none of the characteristics which would go to justify such an investment. It had made no dividends, had no established character, and the result of the investment must have been, at the best, a matter of much doubt and reasonable apprehension. The road was not made, nor was the work begun.

The stock is now worthless, or nearly so. The investment, under the circumstances, was wholly unjustifiable. It was in no public stock, nor in funds adopted or sanctioned by the court. Not only was there no real, but there was no personal security, nor, in fact, any security at all. It was, in the words of the report, " a new and untried project,"— an experiment—money put in trade. It has proved disastrous, a total loss, and the experimenter should bear the loss. *Smith* v. *Smith*, 4 Johns. Ch. Rep. 281; *Swayer's Appeal*, 5 Barr 377; 2 Mad. Ch. Rep. 138–147; *Pocock* v. *Redington*, 7 Ves. 791; *Barrow* v. *Rhinelander*, 3 Johns. Ch. Rep. 615; *Powell* v. *Evans*, 5 Ves. 839.

In *Smith* v. *Smith*, 4 Johns. Ch. Rep. 281, above cited, it was held " if a guardian or other trustee lends the money of

Kimball *v.* Reding.

the *cestui que trust*, without due security, he will be respon-
sible, in case the borrower becomes insolvent." "What is
due security for moneys loaned by a trustee, appears to be
a point not fully settled and established. It seems, in gen-
eral, that personal security is not sufficient to shield the trus-
tee from responsibility in case of loss." See, also, *Swayer's
Appeal,* 5 Barr 377. In the above case, Chancellor *Kent,*
after adverting to the English rules on the subject of invest-
ments by trustees, virtually indorses and applies them.

The cases of *Lovell* v. *Minot,* 20 Pick. 116, and *Harvard
College* v. *Amory,* 9 Pick. 46, relied upon by the appellant,
are distinguishable from the present in several important
particulars, and, as we regard them, substantially sustain
our positions, particularly *Lovell* v. *Minot.* In that case,
the investment was by loan upon the note of the borrower,
then in good credit, secured by a pledge of shares of the
stock of the Nashua Manufacturing Company, which com-
pany had long been in successful operation, at the rate of
about three-fourths of its par value, and less than three-
fourths of its market value.

The court said " there would have been more ground for
the argument that this was an injudicious investment, *had
the money been invested in manufacturing stock,* in which
case the profits would have been contingent. But it was
not so ; it was a loan, at a fixed interest of six per cent., and
the transaction no further exposed to the hazards of trade
than as it affected the value of the pledge."

We understand the court, in that case, to indorse the set-
tled rule, that if the trustee puts the trust funds into trade,
he shall account for the profit, if any is made, and shall
make good the capital, if any portion of it is lost.

The English court of chancery has adopted the three per
cents. as the proper funds for investment of trust moneys.
2 Mad. Ch. Rep. 138, 146, 147 ; *Trafford* v. *Boehen,* 3 Atk.
44.

If the trader lays out money in funds which the court

does not adopt, and it afterwards sinks in its value, the court of equity, though there were no *mala fides*, will throw the loss upon the trustee.   See authorities last above cited.

In this country, the same rule has not been adopted, in terms, for obvious reasons.   But, it is believed, a similar one has been adopted, so far as to require the best securities reasonably practicable, such as real estate, well established State stocks, United States government stocks, or other modes of investment alike tried and safe.   *Smith* v. *Smith,* 4 Johns. Ch. Rep. 281 ; *Ackerman* v. *Emott,* 4 Barb. S. C. 626 ;  *Gray* v. *Fox,* Saxton 259, (cited in 2 Eq. Dig. 628.)

If the trustee invest otherwise, he is liable for the consequences, as under the English rule.   The principle is that " no man is justified in putting property of which he is trustee in jeopardy."   *Pocock* v. *Redington,* 5 Ves. 799 ; *Smith* v. *Smith,* 4 Johns. Ch. Rep. 281.

In *Gray* v. *Fox,* above cited, it was held that " if trustees loan money without due security, they are liable in case of loss by insolvency.   The loaning of trust money, and especially where infants are concerned, on private security, is not a compliance with the rule which requires due security to be taken, and, of course, such loans are at the risk of the trustee."   " In this country," said the court, " the only security safe to trustees, which readily offers, *is real estate, which it is advisable they should always take.*"

And in *Ackerman* v. *Emott,* where executors and trustees were authorized under a will, in New York, to invest legacies generally, no particular mode of investment being pointed out, and they invested the legacies in bank stock, which was retained by them long after the period when the solvency of the bank was doubtful, and the stock depreciated in their hands, by which a large loss was sustained by the legatees, it was held that the legatees and trustees ought to have invested in loans on real security, or in the public stocks of New York, or of the United States, or in loans to the New York Life Insurance and Trust Company, and

that having invested in other and less safe stocks, they were personally liable to make good the loss.

All the authorities concur in holding trustees to a particularly strict accountability in cases of infant *cestui que trusts*, and this for obvious reasons. *Lovell* v. *Briggs*, 2 N. H. Rep. 218, 219; 2 Mad. Ch. 146; *Gray* v. *Fox*, Saxton 559; *Wilkinson* v. *Stafford*, 1 Ves. jr. 32.

The *cestui que trust*, in this case, though not an infant, was in a condition which ought to increase rather than relax the rigor of the rule as to the duty of the trustee. He was, by reason of intemperate habits, wholly incompetent and unfit to have the care of his own property. This clearly appears from the auditor's report. It was for this cause that the testator, his father, left his money in the hands of a trustee. He said that " he might as well throw the money into the river as leave it in Ben's control." It was a case strongly requiring the exercise of fidelity and diligence, the " best skill and judgment," on the part of the trustee. The powers and duties imposed upon the trustee by the testator were, to all intents and purposes, those of a guardian, as appears from the portion of the will reported by the auditor creating the trust. The position of the trustee towards B. M. Swasey, as regarded this fund, was that of a guardian, and the trust fund was B. M. Swasey's whole estate. The arrangement made was equivalent to placing him under guardianship, and was evidently so intended.

For this, as well as for other reasons, no assent or acquiescence of the *cestui que trust*, before or after the investment, could have any effect to justify it. The *cestui que trust* was, in fact, as well as in law, incompetent to confer any such authority. To allow him to control the fund in this way, would defeat the very object for which the trust was created. It was to prevent this very thing that the trustee was appointed by the testator.

The cases of *Brice* v. *Stokes*, 11 Ves. 319; *Langford* v. *Gascoyne*, 11 Ves. 333; *Parkes* v. *White*, 11 Ves.

222, cited by the appellant's counsel, do not apply here, as will be seen on reference to them. The concurrence or acquiescence of the *cestui que trust,* in the acts of the trustee, affecting his estate unfavorably, could operate only when the former should be actually and legally competent to consent, as when the *cestui que trust,* being *compos mentis* and of age, the relations of trusteeship should have ceased. See *Bell* v. *Carew,* 13 Pick. 28.

The relative situation of the parties imposes a general inability to deal with each other in any such way, while the trusteeship continues. For that reason, if a trustee, or person acting for others, purchase the trust estate, the *cestui que trust* will be entitled to have the sale set aside, as of course, however fair the transaction may have been.

As to the relative powers and duties of trustees and their *cestui que trusts,* in this respect, see *Sparhawk* v. *Allen,* 1 Foster's Rep. 9, 22, 23, 24; *Bell* v. *Carew,* 13 Pick. 28; *Litchfield* v. *Cudworth,* 15 Pick. 23; *Copeland* v. *Ins. Co.* 7 Pick. 1; *Harrington* v. *Brown,* 5 Pick. 519; *Arnold* v. *Brown,* 24 Pick. 89–96; 2 Kent's Com. 229; *Hatch* v. *Hatch,* 9 Ves. 297; *Lovell* v. *Briggs,* 2 N. H. Rep. 218; *Road* v. *Yeomans,* 15 Pick. 488, 2 Mad. Ch. Rep. 140–143; 1 Story's Eq. Jur. 312.

No acquiescence of the *cestui que trust,* inferred from failure to make objections after the investment was made, could avail here, in any event, because, from that time, the money was irreclaimable.

The trustee was also in fault in this, that having subscribed railroad stock for himself at the time he did for the *cestui que trust,* he afterwards caused his own stock to be preferred, but failed to prefer that of the latter. He commenced to have it preferred, but failed to complete the necessary steps, and suffered it to be forfeited. He did not take as good care of the trust property as of his own, which he was bound to do. *Scott* v. *Ray,* 18 Pick. 360; *Bryant*

v. *Russell,* 23 Pick. 508–546 ; *Wilkinson* v. *Stafford,* 1 Ves. jr. 43.

If this be not so, if the appellant's positions, on this point, are well taken, then a trustee is bound to use less than that slight diligence required of mere depositaries, and is not liable even for gross negligence, unless fraud or bad faith be affirmatively shown.

A simple depositary, though acting gratuitously, holden only for slight diligence, and liable only for gross neglect, is yet bound to take as good care of the deposit as he takes of his own property, Story on Bail., Tit. Deposits 42–45 ; 2 Kent's Com. 564.

The trustee was interested to have the stock of the Boston, Concord and Montreal Railroad taken. He was, when the subscription was made, a large land owner upon the line of the road, while the *cestui que trust* owned no land. This trust fund was his whole estate. This circumstance of self-interest would be likely to influence the trustee's judgment and his action, " to sway his opinion by private interests and selfish objects." It exposed him to temptation, and would tend to make him, as it did others similarly interested, anxious and importunate to get the stock taken up without duly consulting the interests of those whose funds he invested, or procured to be invested. Such courses become a fraud upon innocent parties, and will not be sanctioned by a court of equity. *Wormly* v. *Wormly,* 8 Wheat. 421.

The same interest existed in Governor Page and Samuel Swasey, relatives of the *cestui que trust,* who advised to the investment. They were largely interested in real estate in the vicinity of said road. This made their counsel entitled to less weight, and less proper to be taken. Besides, the trustee is not to be shielded by acting upon any advice, not even upon the best he can procure, much less when he acts upon bad advice. The rule, upon this point, is different from what it, perhaps, was at one time supposed to be. It was held in the case of *Vez* v. *Emery,* 5 Ves. 144, that

if an executor takes the advice of a lawyer in what he does, the court will not charge him for misconduct. But is said in 2 Mad. Ch. Rep. 152, referring to this decision, that " this is doubtful, and it rather seems that if, under the best advice he can procure, he, the executor, or other trustee, acts wrong, it is his misfortune, but the public policy requires that he should be the person to suffer." Reference is had in the note to *Davis* v. *Blake*, 2 Sch. & Lef. 243. In *Chambers* v. *Minchin*, 7 Ves. 196, it was said " that if a trustee trusts an attorney, he must abide the effect of that confidence."

It would seem to be the dictate not only of law and equity, but of reason, that a trustee should not be able, simply by taking advice of others, to shift all responsibility from himself. Such a principle would defeat all the ends and objects for which trusts and agencies are instituted. But, according to the doctrine of *Vez* v. *Emery*, it could not avail the trustee to have taken the advice of Governor Page and Samuel Swasey, even if they had not been interested. They were not attorneys nor lawyers. In *Vez* v. *Emery*, the master of the rolls said " that if the act upon which the executor was sought to be charged, had been done upon the advice of any gentleman of the law in England, he would not have held him liable." He further said " he (the executor) certainly acted with good intentions and imagined himself justified, but he thought fit to depend upon that which a prudent executor would not have relied upon, (the action of a legal tribunal in Switzerland.) * * * I must hold that the master was right in charging him."

The rule is that trustees are answerable for negligence, though no fraud is imputed, and no kind of interest or benefit. Whether, in this case, there was actual fraud or not, there was, as we think, both interest and gross negligence.

Nor do we understand, with the appellant's counsel, that all presumptions, in a case like this, are to be in favor of the trustee. On the contrary, when the case turned upon the

point of negligence or want of due diligence, every presumption ought to be made against the trustee. *In odium spoliatoris omnia præsumuntur.* *Barrow* v. *Rhinelander*, 3 Johns. Ch. Rep. 620.

II. In relation to the item for " the California outfit."

The same authorities and arguments already adduced, touching the matters of diligence, discretion of the trustee, presumptions, consent and acquiescence of the *cestui que trust*, and the powers, duties and liabilities of the trustee generally, are believed to apply to this part of the case, and so, in the main, of what has been said respecting the trustee's acting upon the advice of Page, Samuel Swasey and others.

The application of the money for this purpose was, we think, an instance of very gross negligence and dereliction from duty, if not of positive bad faith on the part of the trustee.

The journey to California was an enterprize in which it was, at best, of doubtful propriety and wisdom for a sober, robust and efficient man to embark ; a kind of undertaking reserved, in a majority of cases, for the adventurous and the speculative, if not the reckless and the desperate, who had every thing to gain and little or nothing to lose. A more unsuitable person than B. M. Swasey for such an adventure, considering his character, habits, health and state of mind, could not often be found outside of some place of actual personal restraint. He was permitted to go away and make the journey alone and unattended, with no one to take care of him or of his money, though the consent of his relatives had been given to his going, only upon the trustee's promise that the money should be put into the hands of some third person, who would go to California with him, purchase his ticket, and take charge of his funds for him, which promise was entirely disregarded. The auditor finds that " this act of the trustee appears to have been contrary to the talk and understanding he previously had with the brothers and sisters of said Benjamin."

No advice or consent of friends or relatives, with or with-

out conditions, could, as we think, justify the act. The statements made by the trustee at the time are of much significance. He told the sister of Benjamin M., in contemplation of his going away, " that it would not be prudent to let Ben. have the control of the money ; and when Samuel Swasey told him " that he ought by no means to intrust the money to Benjamin," he replied " that he should by no means do it."

The *cestui que trust* left for California March 12, 1850, under the most unfavorable circumstances. In the words of the report, " his intemperance had greatly increased during that winter, and he became much worse than he had ever been before," although " he had quit drinking for a short time previous to his leaving, and was not intoxicated on the morning of his departure."

The money was given to him in the form in which it would be most liable to loss and spoliation.

What occurred to him in going, staying and returning, the condition in which he came back, his loss of money, general destitution, sickness, &c., appear from the report. Disastrous as was the result, it was no more so than was reasonably to have been anticipated at the time and under the circumstances of his setting out. The admissions of the trustee, already referred to, tend not only to characterize the act itself, but manifest the trustee's own understanding of it at the time. In connection with the other facts appearing, they seem to us conclusive of this part of the case.

The argument that because, after the *cestui que trust* came home, prostrated and sick from the effects of the expedition, was put under the care of a physician, gradually cured of his sickness and intemperance, warned by the physician against the use of spirituous liquors as at the peril of his life, against his own wish to resume the use of them, he finally became temperate and well behaved, that " benefit," and the reformation thus effected, are to be put to the credit of the trustee, in his account, and offset against the loss of

the money squandered, seems to us to require no other answer than to be stated.

The auditor's finding that $136,70 of this item was for clothing and debts of the *cestui que trust*, being founded upon evidence of the admissions of the *cestui que trust*, cannot be received by the court unless evidence of such admissions was competent testimony, the appellee having objected to it before the auditor. But if received, it should not go to discharge the trustee, even for that sum. It was a part of the $636,70, and is included in the receipt for that sum, dated March 9, 1850, only three days before the *cestui que trust's* departure for California. It was evidently paid in contemplation of the California expedition, was part of " the outfit," and must share the fate of the rest of that item. It is to be inferred that the clothes were for the same purpose ; and so of the debts. The money paid for the latter cannot be allowed, at least until the trustee shows their nature, and for what they were. The burden is upon him to prove that they were debts proper for him to pay in the due execution of his trust. Till that is done, the presumption is against him. *Barrow* v. *Rhinelander*, 3 Johns. Ch. Rep. 620, before cited.

III. The item of " $40,00 received myself," disallowed by the court of probate and by the auditor, for reasons stated by the latter, does not seem to be now insisted on in behalf of the trustee.

Woods, C. J. It may not be necessary in determining the questions which this cause presents, to review the large list of cases contained in the books, in which the duties, responsibilities and discretion of trustees have been discussed and ascertained. They are very numerous, embracing the various means by which, and the objects for which trusts have been created, to meet the infinitely diversified wants of the authors of them. A great many of these cases turn upon expressions contained in the deeds, wills or other instru-

ments founding the trusts, intended by the parties to limit or to enlarge the discretion of the trustee, or to direct it in some peculiar manner in the pursuit of the general objects of his office, so that their value and pertinency in establishing general rules on the subject, are not proportioned to the ability and learning with which the particular questions involved in them have been examined and settled. That remark is applicable to some of the cases cited in the argument.

The case of *Harvard College* v. *Amory*, 9 Pick. 446, bearing in some particulars a resemblance to the one before us, as it respects the legal discretion of the trustee in making investments of the trust fund, turns upon expressions in the will of the testator indicating with a good deal of clearness what kind of stocks and securities he considered proper investments of the money. They were intrusted with the fund, with discretions " to loan the same upon ample and sufficient security, or to invest the same in safe and productive stock, either in the public funds, bank shares or other stocks, according to their best judgment and discretion," &c., with the further power and direction to sell and reinvest as exigencies might require. And the court, in delivering their opinion, expressly base their conclusions in favor of the trustees upon these expressions in the will. " It is argued for the appellants," says Mr. Justice *Putnam*, " that the trustees have not loaned the money upon good security. The answer is found in the authority which the testator gave to them. They were to loan *or* to invest the sum in stocks. They preferred the latter." And when the judge proceeds to remark that " all that can be required in such cases is, that the trustee shall conduct himself faithfully, and exercise a sound discretion," we are bound to understand the remark, not as containing or intending to enunciate as a general rule, that trustees may, in all cases left to their legal discretion, invest in the kind of stocks there described— bank, factory, insurance or public stocks; but only as confirming the old doctrine, that a trustee is protected who dis-

charges with honesty and a legal discretion the trust, whether a large and liberal or a close and limited one, that has actually been conferred upon him; reference being in all cases had to the instrument creating it, and to the general rules of law for ascertaining the extent of the confidence reposed, and the limits clearly assigned to his discretion.

By the will of Obadiah Swasey, three thousand dollars were directed to be paid to Mr. Southard, to be by him " invested and improved according to his best skill and judgment." That was the first matter entrusted to him. The second was to pay the same to Benjamin M. Swasey, " at such times and in such sums as he," the trustee, " shall judge for my son's interest during his natural life," and afterwards to the heirs of that son. The appeal requires of us an examination of the conduct of the trustee in each of these articles.

I.    The duty of a trustee, to whom money is conveyed for any of the various objects of the charity, benevolence or affection of the donor, when no express or implied directions can be legally derived from the donor himself on the subject, qualifying the general requirements of the law, is to invest the money in good and safe securities. Willis on Trustees, 125.

A considerable number of the cases have turned, as has been said, upon acts or expressions of the testator or other author of the fund, which have been adjudged to have qualified the general duties of the trustee; and a common question has been, upon the effect of certain words in the instrument itself. As to which, it will suffice for the present occasion to say, that where the trustee is directed to use his best skill and judgment, his powers and discretion are not enlarged by the use of those words. The law itself exacts of those who have pledged their faith to the helpless by accepting the care of their funds, the best use of their judgment and skill. And it is equally well settled that the ac-

tual and *bona fide* exercise of those faculties affords no pro-
tection whatever to the trustee who has in fact gone beyond
the limit of his powers, and assumed a discretion or an op-
tion not fairly conferred upon him by the terms of the in-
strument, in their legal sense and import.

As to what securities are to be regarded as safe for the
purposes of a trust investment, the trustee has not, in this
country, the advantage of a precise standing rule, which has
been long since adopted by the English courts, indicating
particular securities as safe ones, in the choice of which the
trustee will be protected against all losses. But, on the
other hand, he is supposed to have the benefit of a some-
what more lenient rule pursued by our courts generally, in
revising his faithful but unfortunate proceedings. Such, at
least, is the impression to be gathered from the remarks of the
Chancellor in *Smith* v. *Smith*, 4 Johns. Ch. Rep. 281, and from
the judgment of the court in *Lovell* v. *Minot*, 20 Pick. 116.
In both of these cases, the question as to what are good and
proper securities is left somewhat at large, and must be con-
ceded to be not without its difficulties.

We think, however, that some general rules on the sub-
ject may be propounded, that cannot well be controverted,
as just and reasonable, and which must settle the present
case, so far as it respects the item of one thousand dollars
invested in the stock of the Boston, Concord and Montreal
Railroad.

Safety is the primary object to be secured in an invest-
ment of this kind, and the trustee is not chargeable with an
income that cannot be realized without hazard to the fund.
And we think, therefore, that an investment is not to be
deemed safe without evidence that it is so, and that the
trustee ought to be able to point out some ruling feature to
distinguish it from a mere adventure. If he invests in prop-
erty, it ought to be property which yields an actual income,
and which has a valuation, in the general sense of the com-
munity, founded on that income, and not upon remote

eventualities and a succession of contingencies. If his dis-
cretion under the trust extends to the buying of stocks at
all, as to which the case does not call for our opinion, his
purchases should be limited to such as have a value in mar-
ket based upon a regular income, or, at least, upon an in-
come that, upon an average for a considerable period, may
fairly be deemed equivalent. If he lends the money, he
ought to be prepared to show that the borrower was, at the
time, possessed of property, and in good credit, and that he
has taken security in the names of persons of like standing,
or, what is less open to question, in property of value, ac-
cording to the usual tests of value.

We mean that the trustee should show that he has en-
deavored to keep within these rules, so that the loss, if any,
has been in spite of these endeavors, and by reason of causes
which have baffled them, whether by misleading his honest
judgment as to the actual character of the property or of the
individuals at the time, or by effecting an actual change and
prostration of them since.

Now it seems to us that the building of a railroad must,
from the very inherent nature of the enterprise, have at all
times been regarded by prudent men as a doubtful adven-
ture. It is necessarily one, with regard to which no favora-
ble inference arises in any strength, from the profitable re-
sults of similar undertakings; for each one must have its
peculiar features. The face of the country, the character of
the climate, the density of the population and their pursuits,
the termini to be connected by the road, are among the ele-
ments necessarily peculiar to each, so obvious to the appre-
hension of every person, and yet so impossible to be esti-
mated, that we cannot entertain a doubt as to the view that
ought to be taken of such enterprises in this connection.

That the trustee in the present case honestly believed that
the investment of the fund in the Boston, Concord and
Montreal Railroad would some day turn out to be a good
one, it is not our province, nor is it our disposition, to ques-

tion. But that as an investment it had any of the features of safety which we have described, or that the trustee could for a moment have imputed to it those qualities, is too plain for doubt.

Nor do we think that he stands relieved, in this particular, by the evidence which has been adduced, that the investment was advised and approved by the friends and relatives of the *cestui que trust*, and by judicious and prudent men whom the trustee consulted. There are cases in which a trustee, acting under legal advice, is protected against an innocent mistake in a doubtful point of law. *Vez* v. *Emery*, 5 Vesey 142. But in the departure which the trustee in this case has made from the legal course of his duty, he has not been misled by the advice of legal men as to what the law exacted of one standing in his place; so the case does not fall within the principle. Neither does it appear that he was deceived by the representations of his advisers as to any facts respecting the character of the security. No one represented the stock as different from what it was. All understood it to be an adventure; and the high expectation that was entertained in its favor did not tend to change its character as a mere adventure, or to clothe it with any of the elements of actual property. The case is a proper one for the application of an observation of Lord *Redesdale,* in *Doyle* v. *Blake*, 2 Scho. & Lef. 243. " The court must proceed, not upon the improper advice under which he has acted, but upon the acts which he has done. If, under the best advice which he could procure, he acts wrong, it is his misfortune."

We are therefore of the opinion that the item of $1000 invested in the stock of the Boston, Concord and Montreal Railroad, claimed by the appellant in discharge, and disallowed by the court of probate, was properly disallowed.

II. In addition to keeping and investing the fund, this trustee was charged, by the will of the testator, with the duty of paying the same to the *cestui que trust,* at such

times, and in such sums as the trustee might judge to be for the interest of the son during his natural life, and afterwards to the heirs of that son.

The intention of the testator as to the manner in which this trust should be executed appears to be pretty clearly disclosed in the words of the will itself. The evidence reported may properly be considered in connection with those words, so far, at least, as it regards the character of the *cestui que trust*, and the impressions of the testator as to the provision that would best suit his condition.

The *cestui que trust* is not a minor, or non compos, nor has he, for any cause, been subjected to the condition of a ward. He is of the age of about fifty-five years, and was esteemed by his father, the testator, as an industrious person, and in other respects worthy. But his appreciation of money, his habits of occasional excess in the use of stimulants, and his ductile and confiding temper, rendered him, in the opinion of his father, unfit to have the control of the portion of the estate which he intended to leave him.

The trustee, who had for many years lived a neighbor to the testator, and his intimate friend, was chosen by him to take care of the son's portion, and to pay the same over to him, at such times and in such sums as he should judge for the son's interest while he lived.

We do not say that either the design of the testator, or the peculiar circumstances of the case, were such as to exempt this trustee entirely from the control of the court, in exercising this branch of his office. Had the son been an infant of tender years, or of infirm health, the exigencies of his case would perhaps have imposed a constraint upon the trustee, to make provision for his support or education. Had he had a wife and children, the education of the latter might have required an appropriation of a part of the fund; and in either of these cases, or in any other case as plain, the court would, no doubt, upon proper application of the trustee for directions, have made a decree accordingly.

Kimball *v.* Reding.

Perhaps, too, in a case of gross neglect or refusal of the trustee to pay over money at such times and in such sums as the interest of the son clearly required, the court might interpose in behalf of the *cestui que trust*, upon his own application, or upon that of his friends.

There have been cases in which executors and others vested with a broad discretion in the apportionment of a fund among several persons, or a class of persons named in the will, have been compelled by the court to make a substantial apportionment to each of the parties, where its interposition has been invoked as a precautionary measure against fraud or collusion; and its direction has been in other cases obtained by the trustees themselves upon application made for that purpose. 2 Fonb. Eq. 199, and cases cited; Sugden on Powers 495.

But no one of the cases supposed is now before the court; and they are put, not for the purpose of declaring opinions which the questions before us do not call for, but for the purpose of suggesting that there are ways and means by which parties interested to have the trust safely and legally executed, may attain that reasonable object, other than by invoking the censure of the court upon the past acts of the trustee, and upon his foregone errors.

In reviewing his conduct in the particular under discussion, it must be remembered that the money was intended by the testator as a benefit to the son personally, to be enjoyed by him as his interests might require. It was bestowed upon the trustee, not for the mere purpose of being hoarded up for old age that might never come, and for heirs that might be strangers to his house, but to be dispensed in sums and at times and for purposes that might seem reasonable, according to the amount of the money, and the condition, character and wants of the party to be benefitted.

Whether after some sixteen years of frugality, in which the *cestui que trust* had had few occasions to call for any part of that which was in a just sense his own, the gratifi-

cation of his desire to travel was sufficiently for his interest to justify the trustee in dispensing to him a small part of the accumulated interest of the fund for that purpose, was a question fairly addressed to the discretion of the trustee, and which the confidence reposed in him by the will authorized him to decide.

He might, in the first place weigh the expenditure of a small sum of money against the mere gratification of the wishes of his ward. He might, moreover, have hoped much from the influence of a change of scene, climate and occupation ; and more than all, perhaps, absence from the companions whose example had aided to debase the habits of the *cestui que trust.* He might have considered, also, that he was sending him to a part of the country where the rewards of labor have sometimes been extremely high, and in which the stimulus of that reward might possibly restore him to habits of industry.

From the evidence it appears that the mind of the trustee for some time vacillated upon the subject, and it does not appear distinctly what finally settled it, unless it was the persistence of Swasey, manifested as it often is in persons of his temper and habits, by a more abandoned indulgence than usual in intoxication. Whatever in fact were the motives which prevailed upon the trustee, it was certainly a case in which, so far as Swasey was himself concerned, there was not much to be risked. A life devoted to the pernicious indulgencies which have been described is worth but little to society, and cannot be of long duration, or productive of much happiness to the party himself; and it is not easy to say that, upon the best views which could have been taken of the circumstances at the time, the trustee did not act wisely under the counsels of the judicious friend whom he consulted.

Nor can we, in view of the consequences, say that his decision was not a good one. The sickness occasioned by the voyage, the climate or other exposures, was but an ordinary

Kimball *v.* Reding.

incident of travel, to all who adventure upon it. The expenditure of money does not clearly appear to have been greater than might have reasonably sufficed for the occasions of a prudent person on so long a journey, and through so much sickness.

But the money was easily spared, and sickness has left him life and a constitution not impaired by it, as it would seem. Above all, something has caused him to abandon his habits of intemperance, and to resume those of industry and sobriety, to a degree to elicit from his friends and the appellee himself the confession that the money, if not wisely, was fortunately expended.

Considering, therefore, the large discretion vested in the trustee by the words of the will, his personal relations with the testator himself, the amount of the fund, accumulated in 1850 to some $5,000, the very complicated state of the circumstances that might have influenced his mind and determined his purpose, and finally the beneficent results of the expedition, in some way brought about upon Swasey himself, we cannot bring ourselves to the conclusion that if he did not act with the greatest wisdom, he has transcended his powers or abused his trust, in the matter of the " California outfit," as it has been termed.

The decree of the court of probate was therefore upon this point erroneous, and must be reversed.

As to the small item of forty dollars the decree is affirmed. There was no evidence on which it could have been allowed.

We order no costs for either party. Both are trustees, and neither has wholly prevailed.

*Decree accordingly.*