The property which Charles G. Campbell had, and which, on the 19th day of July, 1898, he turned over to the Fidelity Trust Company as trustee, was of varied character and of large value. It consisted of real estate, mortgages, bonds, stocks of companies, furniture, pictures, bric-a-brac, money in bank, and other characters of personal property such as an active business man of large means would possess. The face value exceeded the actual value by many thousands of dollars, because among the property turned over were interests in real estate which could not be realized upon, and in some instances the real estate could not be located, and also among the property were bonds and stocks of various companies, which latter were defunct, or, if in existence, the stock of which had no value. *Page 749 
The realized value exceeded $400,000, with some items still undisposed of in the trustee's hands.
The account of the trustee is a very long one, and shows total receipts, principal and interest, of over $700,000, among the numerous items of disbursement being advancements made to the various parties to this suit on account of their distributive shares.
A number of the questions raised under the exceptions were disposed of at the hearing by consents or arrangements between the parties, and only need to be stated without discussion. Others of the exceptions may be grouped, and so much of the trust deed as requires construction for the purpose of determining the rights of the parties need not be discussed separately, but will be dealt with in connection with the subject-matter which it concerns.
 I.
The first exception concerns a series of promissory notes, all, excepting two, of which were made by Charles B. Campbell, the son of Charles G. Campbell (or by firms of which Charles B. Campbell was a member), and endorsed by Charles G. Campbell, the money going to Charles B. Campbell.
After the making of the deed of trust these notes were renewed, and such renewed notes were paid by the trustee. The two notes not coming within the above statement are one made by Denny Brothers and endorsed by Charles G. Campbell, and one made by Campbell Osborne and endorsed by Charles G. Campbell, and paid to the Merchants' National Bank.
The point of the exception is that, under the declaration of trust, the trustee, if it paid such notes, must hold them and charge the amount thereof against the distributive share of the maker of the note. This, of course, depends upon the proper construction of the declaration of trust. This instrument has two clauses which concern this matter of obligations of Charles G. Campbell existing at its date, the fourth and the tenth clauses.
The fourth clause is as follows: *Page 750 
"(4) To pay the interest on outstanding notes, bonds, mortgages, c., given or endorsed by the said Charles G. Campbell, and to provide from time to time for the reduction and cancellation of the same as may be deemed advisable, provided it be done, so far as possible, without interfering with the execution and performance of the trusts hereinafter set forth."
The tenth clause is as follows:
"(10) To hold and retain, without action and without collecting interest thereon, all notes and securities given to Charles G. Campbell by Charles B. Campbell, Anna D. Graham and Edward B. Denny, and now held by assignment by Fidelity Trust Company until the death of the said Charles G. Campbell, and then to cancel and deliver them, without charge, to the said Charles B. Campbell, Anna D. Graham and Edward B. Denny, their respective heirs, executors and administrators."
At the time of the making of the declaration of trust there was held by the settlor and delivered to the trustee a mortgage of E.B. Denny, the settlor's son-in-law, for $2,100, and notes of his for $8,710. At the same time there was held by the settlor and delivered to the trustee company a bond of Anna D. Graham, the complainant, for $20,976.51. Under the provision of the tenth clause these two obligations were canceled at the time of the death of Charles G. Campbell, and the amounts thereof thus became gifts by the settlor to each of the persons named.
There were no notes or other securities of Charles B. Campbell bell held by the settlor and transferred to the trustee, but there were between $16,000 and $17,000 worth of notes of Charles B. Campbell, endorsed by Charles G. Campbell, outstanding in the hands of those who had discounted them.
It is evident that it was with these notes in mind that the fourth clause was inserted.
The exceptant contends that the proper meaning to be ascribed to this fourth clause is that the trustee is to reduce the notes, if it deems advisable, and if, by reduction, they are finally paid off, the trustee is to hold the paid-off note and charge it, after the death of Charles G. Campbell, against the distributive share of the maker of the note.
I do not think that this is the correct construction of this clause, or that it was the meaning of the settlor. I think it clear *Page 751 
that this settlor, who was disposing of all of his property, and had clearly in mind that which he wished to do with it, desired to treat his son Charles, his daughter Anna, and his deceased daughter's husband and her children with similar bounty. At the time of the making of the instrument he had advanced money to his son-in-law and to his daughter, and had obligated himself upon the notes of his son. I think it entirely clear that by these two clause he intended that where he had actually made advances and held an obligation therefor such obligation was to be retained by the trustee without action, and was, at the distribution of the estate, to be canceled and delivered to the obligor, and similarly he intended that the obligation which he had undertaken for his son by endorsing his notes should be met by the trustee from time to time, and when met the note should be canceled.
I cannot conceive of any meaning to be given to the word "canceled" in the fourth clause excepting the well-known one "to render null and void."
This works out the scheme of equity which I think was in the mind of the settlor.
I hold, therefore, that when this estate is to be distributed the trustee is to be credited with the payments of the notes of Charles B. Campbell endorsed by Charles G. Campbell.
This holding also applies to the notes of Mrs. Babbitt, the complainant, which were endorsed by her father and paid by the trustee, and also to the note of Denny Brothers, which was the title under which Edward B. Denny traded.
These notes were in existence at the time of the making of the declaration of trust, and were renewed and subsequently paid by the trustee, and therefore come within the language of the fourth clause.
The only remaining note to be dealt with is that which was in the Merchants' National Bank. This note was made by Campbell 
Osborne and endorsed by Charles G. Campbell. There is no evidence that this note was a renewal of any note or notes existing at the time of the making of the declaration of trust. I cannot find any warrant or authority for the trustee paying this note out of the estate. If it has paid the same, it must *Page 752 
either be surcharged with it, or must, as between the parties hereto, charge the same against the distributive share of Charles B. Campbell.
 II.
The next exception relates to items in the account of commissions on principal retained by the trustee.
Undoubtedly the trustee can only retain such commissions on principal as are fixed by this court, and the matter of this exception will be dealt with in adjusting the matter of commissions.
 III.
The next exception relates to the investment in the gold notes of the Public Service Corporation. The amount involved is $99,750, and the point of the exceptant was that the investment was not one authorized by law.
By consents made at the time of the final hearing this matter was satisfactorily adjusted, the trustee agreeing to charge itself with whatever the proper sum was in respect to this item.
 IV.
The next exception relates to the payment on account of the distributive share of Charles B. Campbell in advance of payments of any of the other distributees, and merely requires adjustment of interest items.
 V.
The next exception relates mainly to items paid to real estate agents and others as commissions on the sales of real estate. These were shown to be proper commissions for the services rendered, and I think it entirely proper to charge them as the trustee has. Any effect which the rendering of these services by *Page 753 
others should have upon the amount to be allowed to the trustee will be taken into account in fixing its compensation.
The items in this exception which are not covered by the above statement are for lawyers' services, and only one item is questioned, the other one being conceded to be correct at the hearing. The questioned item has to do with services at the time of the making of the declaration of trust. I think it clear, since Charles G. Campbell was transferring everything he owned to the trustee, that it is a proper item for the trustee to pay for the services of the lawyers engaged in making the transfers and the declaration of trust, and in giving advice concerning the proper way to accomplish the object of the settlor.
I therefore allow this item.
 VI.
The matter of interest on net bank balances was adjusted at the trial. and was set off against the right of the trustee to charge interest on advances to the distributees.
 VII.
The only remaining question under the exceptions relates to the conduct of the trustee concerning shares of stock of the Prudential Insurance Company.
The par value of this stock is $50, and much confusion resulted at the trial because the custom is to sell two shares at one time and call the same "a full share" — that is, the custom is to deal with this stock as if the par were one hundred, and deliver two shares to make what is termed "one full share." To avoid confusion I have dealt with the stock as it actually was, namely, each share at a par of $50.
At the time of the making of the declaration of trust the settlor owned and transferred to the trustee one hundred and sixty-seven and twenty-seven hundredths shares of such stock This was disposed of by the trustee at the following rate per *Page 754 
share of $50 each: February 23d, 1899, sixty shares at $360; February 6th. 1900, thirteen shares at $350; August 20th, 1901, twenty shares at $375: December 7th, 1903, thirty shares at $200; December 23d, 1903, twenty-five shares at $195; January 25th, 1904, nineteen and twenty-seven hundredths shares at $200.
It will be observed that the first three sales averaged about $360 a share, and that these took place prior to the year 1903. The sales made after that date do not average quite $200 per share. The proofs show that down to about November, 1902, the stock of the Prudential Insurance Company was readily salable at about the average figure shown above, namely, $360 per share, and that since that date the latter average has been about the obtained price, namely, $200 per share.
At about the date in 1902 just mentioned the Fidelity Trust Company and the Prudential Insurance Company endeavored to carry out a scheme by which each should own a majority of the stock of the other, and by this means the existing management in each company could perpetuate its control. In execution of this scheme the Fidelity company offered the stockholders of the Prudential Insurance Company $300 per share for one-half of their holdings. It succeeded in purchasing two shares over one-half of the capital stock of the Prudential Insurance Company. This court (Robotham v. Prudential Insurance Co., 64 N.J. Eq. (19 Dick.)673 (Vice-Chancellor Stevenson, 1903) prevented the execution of this scheme, and the Fidelity Trust Company parted with sufficient of the stock to reduce its holdings below a majority.
The exceptant charges that the trustee, the Fidelity Trust Company, should have known that the scheme it embarked in with respect to the Prudential stock would depress the price or value of that stock, and therefore it should be surcharged on the stock held in this trust, with the difference between the selling price of the stock before it entered upon the execution of the scheme and the lower price at which the stock subsequently sold.
Applying to the trustee the rule of care to which it was subject, I cannot say that I find that it should have known that the necessary result of the proposed scheme would be to depress the *Page 755 
price of the stock of the Prudential Insurance Company. The scheme was undoubtedly conceived with the purpose of perpetuating the management of those then in the control of each of these companies. But, as appears by the facts stated in the cited case, each was solvent and possessed of large assets and of a great and valuable business, and the business of each was growing and not diminishing, and I do not think it fair to infer that a reasonable man should have believed that perpetuating the then management would lessen the value of the stock of either of the companies. Whatever the result may have shown the fact to be, I do not believe that at the time the scheme was proposed and was attempted to be carried out there was any thought in the minds of the parties that it would decrease the value, in the market, of the stock of the companies concerned. The very fact that the parties engaged wished to retain control, and invested large sums of money for that purpose, shows that they thought that each institution was a valuable one and would so continue.
I do not therefore concur in the point made by the exceptant that, under the rule concerning the care with which a trustee is chargeable under such circumstances, this trustee is to be surcharged in this respect.
I do find, however, that the trustee is to be surcharged with the difference between the fair market value of this stock down to 1903 and the price at which it was sold in 1903 and 1904, for the reason about to be given.
The trust in this case was of a unique character. It was a transfer by a living person of all of his property of every kind and description, including even his household goods and his money in bank. It was, in the broadest sense of the word, a general trust. Under such circumstances I think it the duty of the trustee, so soon as it could do so in the exercise of reasonable diligence and good judgment, to convert the securities which came to it from the settlor into cash and invest the same in securities authorized by law.
It is admitted by all of the counsel in the case that there is no statute law involved, excepting to the extent that the statute points out the investments in which trustees are authorized to *Page 756 
place trust moneys, and it is conceded that the stock of the Prudential Insurance Company is not one of those so authorized.
The general principle deducible from the cases and text-books is well stated in 17 Am. Eng. Encycl. L. 454, as follows:
"While a fiduciary may, as a rule, in the exercise of his discretion, retain such investments as are proper for the fiduciaries to hold, all others he must call in, and invest the proceeds in an authorized manner." Perry Trusts, §§ 460, 461,465; Ashhurst v. Potter, 29 N.J. Eq. (2 Stew.) 625 (Court ofErrors and Appeals, 1878).
The trustee in the case at bar seeks to escape the responsibility involved in the application of this principle. In the brief of counsel for the trustee its position is thus stated:
"The rule contended for has undoubted existence, but is not of universal application. It is applicable to trusteeships where the subject of the trust has come to the trustee as a general
estate or an aliquot portion of an estate, but is not applicable where it comes as certain and specific property, unless there be a direction to convert."
It therefore insists —
First. That this was a trust of a specific thing, and that it was entitled to hold that thing, chargeable only with the exercise of reasonable discretion.
Second. That by the declaration of trust it was given discretion with respect to investments, and therefore is not chargeable for anything excepting negligence.
As I have before said, I do not concur at all in the view that this is a trust of a specific thing, or that this is a case to which the authorities relating to duties of trustees under trusts of specific things can be applied. It is true, of course, that a specific thing, or rather a great number of specific things, were by this settlor turned over to this trustee, but the real transaction was a turning over by the settlor of everything that he possessed to the trustee for it to handle and manage under its obligation as trustee, subject to the responsibilities thereof.
I shall not stop to cite or analyze the various cases in which the subject-matter of the trust was held to be specific, but will content myself with saying that in each case, as I have read them, it was clear that the settlor intended that the identical thing transferred should be held by the trustee. There is not *Page 757 
the slightest evidence in this case of the settlor's intention that this trustee should hold any specific thing, and it is quite clear, I think, from the circumstances, that there could have been no such intention. Among other property transferred to the trustee were household furniture, pictures, bric-a-brac, and money in banks. Certainly it was not intended that these several species of property were to be held in specie by the trustee. Similarly there is nothing to show that any of the transferred property was to be so held. The intention clearly shown was to hand over all of the property owned by the settlor to the trustee for the latter to deal with as trustee, and under such circumstances the law is clear that the trustee can only escape responsibility by converting the unauthorized securities thus transferred to it into authorized securities so soon as it conveniently and reasonably may do so.
In the case in hand it is clearly shown that it could have sold the Prudential stock during the years 1898, 1899, 1900, 1901 and 1902 for at least $360 per share. The income from this stock was very small, being ten per cent. Upon $50 par, and therefore about one and one-half per cent. on the market value of the stock. There was therefore no reason, properly viewed by the trustee, to induce it to hold an unauthorized security, paying so little, at a time when the market for its sale was open and a large price could have been obtained for it, and that price could have been invested in authorized securities to yield a rate of interest at least three times greater than that received from the then investment.
With respect to the argument that by the terms of the declaration of trust the trustee was so vested with discretion that it is not chargeable for maintaining unauthorized investments it is necessary to refer to the language of the instrument.
The material part thereof is that in which the trustee declares that it holds the property, real and personal, in trust for the following uses and purposes:
"To hold and possess or dispose of and convey the same, by proper instruments of conveyance, as in its judgment may be deemed advisable, and to collect the principal of securities and reinvest the same from time to time." *Page 758 
From this clause the respective parties draw diametrically opposing meanings. The complainant insists that the meaning of this clause is that the trustee has enjoined upon it the absolute duty of collecting the principal of securities. In other words, it draws from this clause the inference that the settlor intended to direct the trustee to collect the principal of securities, and therefore it has not only the duty cast upon it by law, but also the positive injunction of the settlor with respect thereto.
The trustee, on the other hand, lays great stress upon the presence of the words "as in its judgment may be deemed advisable," and argues that they relate not only to the first part of the sentence concerning conveyances, but also to the last part of the sentence. It therefore repudiates the idea that it was directed to collect the principal of securities, and contends that the whole matter was left to its discretion, and it can only be chargeable if negligent.
The trustee further argues that stocks are not "securities," and therefore, even if it is required to collect the principal of securities, this would not relate to stocks generally.
I do not find it necessary to determine whether this clause should be construed so as to positively require the trustee, by force of its terms, to convert the securities, including the stocks, into money, and reinvest the same in authorized securities, because I think the result of a fair reading of this clause in any legitimate way is not to vest in the trustee any greater or other discretion than is vested in trustees generally.
Differently stated, I think that this clause confides the property to the trustee to be dealt with as its judgment deems advisable, subject to those rules which govern trustees; that its discretion, in other words, was not to do unauthorized things, but to exercise its judgment concerning what authorized things it would do.
I do not find from the authorities that it is the rule to exempt trustees without a clear and unequivocal statement of intention to that effect made by the maker of the trust in the instrument creating or evidencing it. Ward v. Kitchen,30 N.J. Eq. (3 *Page 759 Stew.) 31 (Chancellor Runyon, 1878); McCullough v. McCullough,44 N.J. Eq. (17 Stew.) 313 (Chancellor McGill, 1888); Halsted v.Meeker's Executors, 18 N.J. Eq. (3 C.E. Gr.) 136 (ChancellorZabriskie, 1866); King v. Talbot, 40 N.Y. 90; Adair v.Brimmer, 74 N.Y. 539; Clark v. Beers, 23 Atl. Rep. (Conn.)717; Spratt v. Wilson, 19 Ont. 28; Kimball v. Reding,31 N.H. 352.
In the case of Tuttle v. Gilmore, 36 N.J. Eq. (9 Stew.) 617(Court of Errors and Appeals, 1883), the clause limiting the liability of the trustee provided that he should not be liable or responsible for any other cause, matter or thing except his own willful and intentional breaches of the trusts therein expressed and contained. The present chancellor, in writing the opinion of the court, said: "It is a breach of trust for the trustee to speculate with trust funds for his own gain, but it is no less a breach of trust to make unauthorized investments. * * * To do so knowingly is a willful and intentional breach of trust. In my judgment it is a willful and intentional breach of trust, within the meaning of this clause, to knowingly do any act hazarding trust funds in violation of a duty imposed on a trustee. That this construction may leave but little force to the clause is no reason why it should not be adopted."
It will thus be seen that it is settled in this state that a clause restricting the responsibility of the trustee, in terms much broader and more comprehensive than in the case at bar, was held not to exonerate the trustee.
In the same case the court holds that "a strict rule of construction should be applied as against the claim of restriction."
I therefore conclude that this trustee is chargeable with the difference between the price at which the seventy-four and twenty-seven hundredths shares were sold in 1903 and 1904, namely, about $200 per share, and $360 per share, which I find to be the price at which it could have been sold at any time within five years after the date of the execution of the declaration of trust. *Page 760 
 VIII.
The remaining question relates to the matter of compensation to the trustee.
While it was urged by the complainant in her brief that there should not be any allowance of commissions to this trustee, I can perceive no legitimate ground for withholding the same.
It is true that in certain respects this trustee is found by the court to be subject to surcharge, but its conduct has not been willfully wrong, nor has it confused accounts, unwarrantable used trust moneys, or done any of the things which have been held to disentitle trustees to compensation.
It is, of course, true that a general rule of law applies alike to those possessed of small means as well as those possessed of large, but it is equally true that where a trustee is possessed of very large resources, as this trustee is, and therefore nothing that it has done could possibly jeopardize the interests of the cestui que trust, and the latter would, in every event, receive all that the court found due to them, a different situation exists than if a trustee of meagre resources should make unauthorized investments and thereby jeopardize the interests of the cestui que trust, and make it possible that they would lose what ought to come to them.
I see no reason for treating this trustee in any other than the normal way in fixing its compensation.
The discretion of this court in this class of cases as to the amount to be allowed is unfettered by statute, and the compensation should be based on the nature and amount of the services rendered and the risk incurred by the trustee. VanHouten v. Van Houten, 45 N.J. Eq. (18 Stew.) 796 (Court of Errorsand Appeals, 1889).
Holding this trustee, as I do, to a strict accountability, I think that its allowance should be commensurate with such responsibility. If the contention of the trustee was found to be sound, and it was only chargeable for negligence, and would be held to have done its duty if it merely retained the securities and collected *Page 761 
the income, then I think a small allowance would compensate it fully for its responsibility. (I am only speaking of an allowance upon principal, because, under the terms of the declaration of trust it was to receive five per cent. upon the income, and it has already, under such clause, taken its commissions on income.) But I think that where a trustee has a very large estate, such as this one was, of a most varied character, handed over to it, and is required by the rule, applied to it by the court, to exercise due diligence in the calling in of all unauthorized investments and the duty of investing in authorized securities, it should be paid a proper sum to compensate it for this labor and the responsibility and risk involved.
In view of the rule which I apply to this trustee, I do not think that four per cent. upon the amount of principle is too large a sum for the time, labor, responsibility and risk involved. It had the estate in its charge from 1898 to date, and, in addition to the ordinary duties in an ordinary trust, there were unique duties imposed upon this trustee, because, as has been before stated, many of the apparent securities turned over were worthless, and that fact could only be ascertained after patient investigation and much trouble, and in each instance it had to take the risk of its conduct. And, with respect to the valuable property, it performed its duties well, the surcharge resulting from a misconception of duty and not from a willful disregard thereof.
In the Van Houten Case (cited above) the court of errors and appeals set the figure as three and one-half per cent.; I think the additional one-half per cent. allowed by me in this case fairly represents the additional services and risk involved.
Application is made by the various counsel for costs, including counsel fees, to be paid out of the estate. This seems to be of the class of cases in which, under the practice and as a matter of authority, allowances should be made. Trustees v.Greenough, 105 U.S. 527; 26 L. Ed. 1157.
The matter of the amounts may be settled upon the setting of the decree, which will be done upon notice.
 *Page 375