> **NOT FOR PUBLICATION WITHOUT THE**
> **APPROVAL OF THE APPELLATE DIVISION**
>
> This opinion shall not "constitute precedent or be binding upon any court."
> Although it is posted on the internet, this opinion is binding only on the
> parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0929-16T1

IN THE MATTER OF THE
TRUST OF RAY D. POST.

_____

Argued May 3, 2018 — Decided August 15, 2018

Before Judges Haas, Rothstadt and Gooden Brown.

On appeal from Superior Court of New Jersey, Chancery Division, Probate Part, Morris County, Docket No. P-000817-2012.

Michael A. Saffer argued the cause for appellant/cross-respondent Valley National Bank (Mandelbaum Salsburg, PC, attorneys; Michael A. Saffer, of counsel and on the briefs; Arla D. Cahill and Brian M. Block, on the briefs).

Andrew J. Cevasco argued the cause for respondent/cross-appellant Sarah E. Post-Ashby (Archer & Greiner, PC, attorneys; Andrew J. Cevasco, of counsel and on the briefs; Andrew T. Fede, on the brief).

Deborah Post, respondent/cross-appellant, argued the cause pro se.

PER CURIAM

Valley National Bank (Valley), trustee for The Trust of Ray

D. Post, appeals from a judgment awarding damages to beneficiaries,

the grantor/decedent's granddaughters, Deborah Post and her sister, Sarah Post-Ashby. The trial judge held that Valley breached its fiduciary duty to the sisters when it diversified the trust's corpus, a portfolio of stock, in contravention of a retention provision in the trust agreement that directed the stocks not to be sold. Although the judge awarded damages to the sisters, he also awarded commissions and fees to Valley.

On appeal, Valley asserts numerous arguments, the gist of which is that the judge erred in finding that Valley's actions were not authorized by the Prudent Investor Act (PIA), N.J.S.A. 3B:20-11.1 to -11.12, especially since the corpus of the trust changed in nature over the years due to various corporate reorganizations. Deborah and Sarah[1] cross-appeal, claiming that Valley was not entitled to certain fees and commissions the trial judge credited to Valley, and that he failed to correctly calculate damages and should have awarded counsel fees. For the reasons that follow, we affirm.

The facts developed at the bench trial in this matter are summarized as follows. Ray owned and operated a fuel oil distribution business in Newark. He and his business were customers of the Peoples National Bank & Trust Company of

---

[1] We refer to the individuals by their first names to avoid any confusion caused by their common surnames.

Belleville (Peoples) and he was a member of its board of directors until the mid-1980s. Ray created the subject irrevocable trust, appointing Peoples as trustee, pursuant to a trust agreement dated July 23, 1975. The corpus of the trust consisted of 2550 shares of common stock of AT&T, 304 shares of Exxon Corporation, and a $4500 AT&T thirty-year bond due May 5, 2000. The value of the trust assets at that time was $156,550.25.

The trust agreement contained a retention provision that stated: "The Trustee shall retain, without liability for loss or depreciation resulting from such retention, the property received from the Grantor." It also provided that the trustee was "entitled to compensation for its services . . . in accordance with a separate agreement between it and [Ray], to be entered into on or before the execution of this Agreement." On September 24, 1975, Ray and Peoples entered into a letter agreement that stated: "In order to induce Peoples . . . to act as Trustee . . . I hereby agree to pay a fee of 5% per annum on the total income collected."

Pursuant to the trust agreement, the trust's income was paid to Ray in monthly or other installments during his life and, upon his death, the income was paid to Ray's wife, Enid Post, whom he had married in 1974, until her death or remarriage.[2] Upon the

---

[2] Enid was not Deborah's or Sarah's grandmother.

occurrence of either of those two events, the trustee was directed to distribute the corpus to Deborah and Sarah.

Ray died on May 5, 1989. At the time of his death, the value of the trust's assets was $483,172. The trust corpus consisted of 1169 shares of Bell South, 520 shares of NYNEX, 1040 shares of Pacific Telesis, 780 shares of South Western Bell, 1040 shares of U.S. West, 2432 shares of Exxon and 2200 shares of AT&T.[3]

Deborah, who held a Masters of Business Administration from Harvard Business School, was appointed executrix of the estate and, in 1990, filed the first Form 706 Estate Tax Return. Deborah, as executrix, also participated in a litigation filed in approximately 1991 by Enid over Ray's estate in which the trust and its assets were a topic of the dispute. See In re Estate of Post, 282 N.J. Super. 59, 64 (App. Div. 1995).

In June 1993, Valley acquired Peoples and became the trustee. The trust assets Valley received from Peoples, according to Valley, totaled $157,436.86. The stock included 2600 shares of AT&T, 2432 shares of Exxon, and approximately 7000 shares of seven companies

---

[3] To the extent the portfolio contained different stock than what Ray had deposited, the difference was caused by the divestiture of AT&T and the creation of its "spin offs" that were required by the 1984 anti-trust action against AT&T. See Verizon N.J., Inc. v. Hopewell Borough, 26 N.J. Tax 400, 408 (Tax Ct. 2012); In re Estate of Strauss, 521 N.Y.S.2d 642, 644 (N.Y. Sur. Ct. 1987).

that had also been created as part of AT&T's divestiture. When Valley became trustee, it began to take statutory corpus commissions[4] from the trust in addition to the five percent income commissions provided for in the fee agreement, even though Peoples had never done so while it was trustee.

In May 2000, Valley's in-house counsel wrote a memo addressing the bank's trust investment management committee's concern about whether the trust was adequately diversified in light of the enactment of the PIA in 1997. In response, Valley obtained advice from outside counsel in July 2000, who concluded that the trust's retention provision did not relieve Valley of its duty to diversify the portfolio.

In his letter to Valley, counsel stated that he "believe[d] that a court would conclude that the language of [the retention provision] did not deprive [Valley] of power to sell the stock . . . ." Counsel advised that if Valley determined that "non-diversification [was] prudent," it could take no action and "rely" on the retention provision, or it could "develop and implement a plan to diversify the portfolio," if it "decide[d] that that is the most reasonable and prudent course of action." If Valley chose to diversify the portfolio,

---

[4]  N.J.S.A. 3B:18-14.

> it could choose to notify [Enid] and [Deborah and Sarah] of its plans and seek out their consent or other points of view. Finally, to fully protect itself for its course of action, [Valley] could file an action . . . judicially . . . and . . . seek authorization to deviate from the language of the trust and diversify the portfolio.

Valley began diversifying the trust assets on September 12, 2000, selling 864 shares of ExxonMobil stock and purchasing other stocks with the proceeds without either court approval or notice to Enid or the sisters.[5] In a follow-up letter from outside counsel in November 2000, Valley was advised that it not unilaterally deviate from the retention provision because it would then be "acting at its own peril" in light of recent (unpublished) case law.[6] "Rather, to fulfill its investment responsibilities . . ., [Valley] should apply to [the] Court for advice and restrictions to satisfy its obligation to protect the interests of the beneficiaries." By so doing, it would have an "insurance policy" against future liability. Despite that advice, and while Valley understood that the trust language severely restricted its ability to sell or reinvest the trust assets, it continued the

---

[5]  Exxon became ExxonMobile after an intervening merger in 1999. See In re Exxon Mobil Corp. Sec. Litig., 387 F. Supp. 2d 407, 410 (D.N.J. 2005), aff'd, 500 F.3d 189 (3d Cir. 2007).

[6]  In re Vivos Trust of Ackerson, No. A-159-99 (App. Div. Oct. 23, 2000).

A-0929-16T1

diversification until shortly before Enid's death in 2008, without expressly notifying Enid or the sisters or seeking court approval.

Although Valley did not seek Deborah's or Sarah's prior approval for not retaining the trust's stocks, or provide either of them with a copy of the trust agreement until Enid died, it did send statements and other information about the trust's holdings that reflected the sale of the original stocks. Deborah began receiving information about the trust after she made a request in March 1998 for information. She started receiving annual statements from Valley in 2002 and they continued until Enid died in 2008 at which time Deborah began to receive monthly statements.

In April 2004, Valley also sent Deborah and Sarah a letter seeking their approval for a "30% fixed income and the balance . . . in equity/growth positions" asset allocation. They both gave their approval to the allocation. At the time, neither Deborah nor Sarah had seen a copy of the trust agreement. According to Deborah, Ray never showed her a copy, she did not recall seeing it in connection with her filing of estate tax returns or during the estate litigation, and she only became aware of the trust assets after Ray's death.

According to Sarah, she did not read or view the trust agreement until she received Valley's letter in April 2004 seeking her approval of the trust's asset allocation. When Sarah approved

the April 2004 proposed assets allocation, she also requested that she be provided the same information regarding the trust that Deborah had been receiving. After that time, Sarah began receiving annual statements. However, according to Sarah, none of the ensuing letters she received from Valley contained information about the terms of the trust.

Enid died on March 27, 2008, triggering Valley's obligation to distribute the corpus to the sisters. Valley wrote to Deborah and Sarah on May 2, 2008, enclosing a copy of the trust agreement and setting forth the trust assets. According to an account investment synopsis prepared by Valley, as of July 31, 2001, the value of the trust was $1,431,869.06, as of April 30, 2006; $1,084,988.51, as of August 2007, $1,286,678.88; and as of May 2, 2008, $1,218,556. Valley informed the sisters that the process of preparing a final accounting had begun and would take several months to finalize, due to the extended term of the trust.

The first time Deborah or Sarah saw the trust agreement was when Valley sent it to them on May 2, 2008. When they did, Deborah "probably skimmed it," and Sarah "did a casual review" of the document, but neither recalled reading the retention provision. The granddaughters only became aware of the provision when, in March 2012, Valley filed its complaint for approval of its final accounting.

In 2009 and 2010, Valley sent requests to Deborah and Sarah asking them "what type of accounting you would like us to prepare for your review and approval in order that we may conclude the administration of the Trust." According to Deborah, she did not respond to these requests because Valley had been unresponsive to her requests for information, such as any previous accountings and financial statements prior to 2001. Sarah too did not respond because she did not understand the requests. The fact they did not respond, however, did not prevent Valley from preparing an interim accounting for submission to the sisters.

On October 6, 2010, Valley's attorney sent a letter to Deborah and Sarah requesting that they sign a waiver of a formal accounting, and provided them with an informal accounting. Deborah did not sign the waiver because of Valley's failure to provide information she previously requested about the trust for the period from 1975 to 1992. Sarah also did not respond to the attorney's letter because she was not provided with sufficient information and felt the formal accounting was "pressuring" her with more fees.

Deborah met with Valley's trust officer Steven Gudelski in January 2011 and complained about the trust's performance, Valley's failure to provide information and an accounting, and Valley taking what she considered to be excessive fees. The

retention clause and diversification of the stock were not discussed, but Deborah asked for a copy of the fee agreement and was told there was no written agreement. A month later, however, Gudelski provided Deborah with copies of annual statements from between 2002 and 2010, and a copy of the trust fee agreement, which Gudelski discovered after a further review of the file. In June 2011, Deborah wrote to Gudelski asking that he provide her with records from Peoples and Valley's computer records in connection with the trust from June 1993 until February 2001. Valley eventually provided a final accounting during discovery after it filed its complaint.

On March 19, 2012, Valley filed a complaint to approve a final trust accounting and to be discharged as trustee. According to Valley, it took four years to complete the final accounting because it was "waiting to hear from the beneficiaries as to what type of accounting they wanted."

The accounting was ultimately completed between the summer of 2011 and November 2011. A vice-president and senior trust officer at Valley prepared the accounting covering the period from June 22, 1993 to November 30, 2011. The final accounting stated that the trust's value was $901,578.73. Approximately $563,000 was in a cash management account for the period beginning June 22, 1993 through November 30, 2011; the balance was stocks and mutual

funds. Over the subject time period, $60,225.45 was added to principal as a result of tax refunds. Valley took a total of $485,491.03 in income commissions and $96,450.51 in corpus commissions, constituting .5% on the first $400,000, and .3% on the balance. Valley stopped taking fees in November 2010.

On April 12, 2012, Deborah filed an answer taking exceptions to the accounting. She objected to Valley taking commissions on the trust's corpus, and claimed that Valley was only entitled to a five percent commission on trust income rather than six percent.

The matter was referred for mediation and on the night before a scheduled session, Deborah read the trust document "word for word with complete comprehension for probably the first time." She was "astounded" because she "had no idea . . . that this retention clause existed in this document." She "suddenly realized [that] they weren't allowed to sell [her] grandfather's good stocks." As a result, Deborah amended her answer to add a counterclaim for breach of fiduciary duty, negligence, conversion and breach of the implied duty of good faith and fair dealing, all arising from Valley's violation of the retention provision. She claimed an over $900,000 loss as a result of Valley's failure to "abide by and honor Ray Post's wishes pursuant to their fiduciary duty of care" to the beneficiaries. Sarah filed a similar answer and counterclaim.

On April 15, 2015, a judge signed an order granting Valley's motion for summary judgment as to all counts of the sisters' counterclaims, except for breach of fiduciary duty and the implied covenant of good faith and fair dealing, and granted in part the sisters' motion to compel discovery and distribution of the trust assets.

Trial was held before a different judge, Stephen C. Hansbury in April 2016. The trial initially addressed the sisters' counterclaims and Valley's liability. At the trial, in addition to Valley's representatives and the sisters, who testified about the history of the trust as set forth above, the parties presented testimony from experts.

Richard Greenberg, a lawyer and certified public accountant, testified for the sisters as an expert in trust administration. He concluded that Valley breached its fiduciary duty as trustee by violating the retention clause of the trust agreement. He cited the PIA, which grants the trust settlor the right to restrict the general duty to diversify as long as the settlor expressly provides for that restriction in the trust document. As Greenberg explained, if a trustee believes the restriction is not in the best interests of the beneficiary, it should seek the consent of the beneficiary or apply to the court for approval to diversify.

John Langbein, a trust and estates law professor, who has trained bank trust officers and served on an advisory panel for the drafting of the Restatement (Third) of Trusts, testified for Valley as an expert in the standard of care applicable to a trustee and trust assets. He stated that the trust portfolio was under-diversified because the stocks did not involve "a wide number of different industries" and confining the portfolio to two securities was "capricious." Valley had a "duty to diversify" in order to avoid the risk of "catastrophic loss." Langbein concluded that Valley's decision to diversify was "routine good trust administration." Failure to do so, he stated, would have put Valley at risk of a breach of fiduciary duty by violating the duty to diversify. He did not believe that a trust beneficiary was entitled to prior notice or to give its consent prior to the trustee diversifying because management of the trust lies with the trustee, and a beneficiary has "no voice in investment policy." Nor did he believe that Valley was under an obligation to seek court approval before diversifying because approval is for the trustee's benefit, not the beneficiaries'. Nonetheless, he believed it was highly likely that Valley would have received judicial approval. He added that Valley's decision to seek the advice of outside counsel showed prudence, but that the advice provided was not conclusive because, as a general matter, a trustee

could then "keep on shopping" until it found someone "willing to . . . do anything [it] wanted."

Even if the diversification constituted a breach of fiduciary duty, Langbein believed that the breach was "innocuous" because it was done for the beneficiaries' and not Valley's, benefit.  In support, Langbein cited to the Restatement (Third) of Trusts § 95 cmt. d (Am. Law Inst. 2012) "innocuous breach rule," which he explained was an "old principle of equity . . . that when the trustee has acted in a way that was not driven by trustee self interest [and] that was motivated by the effort to benefit the beneficiaries, . . . the court has the discretion not to find them liable. . . ."

On April 28, 2016, Judge Hansbury issued an oral decision finding in favor of the sisters as to Valley's liability.  The judge first addressed the trust agreement and found that since its inception, the sisters owned the corpus.  He then rejected Valley's contention that "because the Exxon stock and the AT&T stock morphed, . . . that . . . was in itself . . . a diversification which then permitted [Valley] to diversify as it chose. . . ."  According to the judge, there was "not a shred of evidence" that the stock held in the trust after the various corporate restructurings was "not substantially equivalent" to what was

originally held. The judge stated while the stocks may have changed, it did not "trigger the right to simply diversify."

Judge Hansbury turned to the PIA and rejected Valley's argument that the statute trumped the settlor's intent as expressed in the retention provision. Quoting from one of our earlier unpublished decisions relied upon by Valley, Judge Hansbury found the opinion persuasive as to its statement that "diversification of investments, N.J.S.A. 3B:2-11.4, . . . is a default rule that may be expanded, restricted, eliminated or otherwise altered by express provision of the trust agreement, N.J.S.A. 3B:20-11.2(b)."

Next, Judge Hansbury considered Valley's "standard of conduct" and concluded it breached its duty to the sisters by not following the advice of its own attorneys to seek their approval or the court's approval before diversifying, and its failure to keep the sisters informed as to the status of the corpus. The judge relied upon the experts' testimony and the provisos of Restatement (Third) of Trusts, which set forth a trustee's obligation to keep a beneficiary reasonably informed. The judge found that "months, years went by and no information was provided" to the sisters.

Judge Hansbury also found that contrary to Valley's arguments, neither laches, equitable estoppel nor the sisters' conduct provided Valley with legitimate defenses to the sisters'

15

counterclaims. He stated that Valley unjustifiably delayed its preparation of the accounting and seeking court approval for four years following Enid's death.

Judge Hansbury concluded that there was a breach of Valley's fiduciary duty, but he did not find that Valley acted in bad faith. The judge, therefore, found Valley liable to the sisters under that cause of action, but dismissed their claim for a violation of the covenant of good faith and fair dealing.

The judge considered counsels' arguments regarding the valuation date to be applied in his calculation of damages based upon what the value of the portfolio should have been had the retention provision been honored compared to its actual value. The sisters contended the date was the day of the judge's decision. Valley argued it should be when the sisters knew or should have known about the retention provision. It contended that the date Deborah filed the first estate tax return, or the commencement date of the estate litigation that Deborah participated in were appropriate dates for valuation because Deborah should have known about the retention clause at those times. It also argued as an alternative, October 6, 2010, when Valley sent the waiver and release to Deborah and Sarah as the appropriate date.

Judge Hansbury determined that the proper date for valuation of the stocks' value was May 2, 2008, when Valley sent the trust

16

agreement and portfolio value to the sisters. He found that on that date, Deborah and Sarah had the "the trust agreement, they ha[d] the statements that they've been getting for several years[,]" and they first learned that the retention provision was not being followed.

Trial on damages was held on June 13, 2016. After considering an in limine motion filed by Valley, Judge Hansbury granted the motion, barring the sisters from presenting any evidence regarding Valley not investing trust money held in Valley's Cash Management Fund. The judge found that the sisters failed to present any evidence at the liability trial about Valley's failure to invest.

At the ensuing damages trial, Michael Gould, a certified public accountant, testified for Valley and concluded that the estimated value of the trust assets, assuming that Valley had not diversified the portfolio, as of May 2, 2008 was $1,739,248, which was $520,692 more than the actual value of $1,218,556. Gould utilized the first quarter 2008 income taxes, $9606, actually paid by the trust in determining the hypothetical portfolio's after tax value. He added: "It's not necessarily related to any particular sale of securities. It was just an estimate . . . ." He denied that constituted double counting, adding for clarification:

> [W]hat the [$]9606 represents are the estimated income taxes for 2008 that were paid by the trustee in April of 2008. And we used

17

> it as a reduction of the hypothetical portfolio on the basis that dividends . . . and interest would have been received by the trust and income taxes would have had to been paid in some amount. And rather than . . . try to calculate what the hypothetical tax would have been, we just used the estimates that were paid. It was just an estimate. An imprecise estimate. . . .

Joseph Matheson, a certified public accountant, testified on behalf of the sisters and concluded that the estimated value of the trust assets, assuming that Valley had not diversified the portfolio, as of May 2, 2008 was $1,833,306, which was $616,467 more than the actual value of $1,216,839. Matheson testified that he determined the share amount for the stocks by averaging the "daily high and the daily low on May 2nd" because the stocks "probably would have sold . . . sometime . . . during the day." Next, he stated that he "subtract[ed] the [capital gains] tax and then . . . added the net proceeds" that totaled $1,833,306. Matheson also admitted that Gould's report reflected $2600 of "dividends between Enid's death and May 2nd" that was missing from his calculations in his report, which increased the difference between the value of the hypothetical portfolio and the actual value by $619,897.

On July 8, 2016, Judge Hansbury signed an order for judgment approving the accounting submitted by Valley through 2011, and entered judgment against Valley in favor of the sisters for

18

$520,548 based upon Gould's calculations. Attached to the judgment was a statement of reasons in which he identified September 2000 as the date when Valley breached its agreement by selling trust assets. He also concluded that consistent with Ray's intent as expressed in his agreement with Peoples, Valley was entitled to the income commissions expressed in the agreement as well as statutory corpus commissions under N.J.S.A. 3B:18-2. Relying upon the court's holding in <u>Babbitt v. Fidelity Trust Co.</u>, 72 N.J. Eq. 745 (1907), he also concluded Valley was entitled to commissions even though it breached its fiduciary duty by diversifying because it did not do "anything 'willfully wrong.'"

On August 31, 2016, Judge Hansbury signed an order awarding the sisters $57,423.08 in prejudgment interest from May 2, 2008, to July 8, 2016, denying the parties' cross-motions for counsel fees and Valley's application for corpus commissions from November 1, 2010, to July 27, 2016.[7] In his attached statement of reasons, the judge explained how he applied the <u>Rules</u>' provision for pre-judgment interest, <u>see</u> <u>R.</u> 4:42-11, for the period during which the sisters were deprived of their funds, which he identified as May

---

[7] On September 20, 2016, Judge Hansbury signed an amended supplemental order of judgment reducing the amount of prejudgment interest awarded to $48,654.13, pursuant to N.J.S.A. 4:42-11(b). In support of the order, he issued a written decision, explaining in detail the error he made in its original calculation and showing how the corrected amount was calculated.

2, 2008 to July 8, 2016. He turned to the parties' claims for counsel fees and rejected them. As to Valley, he concluded it was not entitled to fees for defending itself, especially in light of his finding that it breached its fiduciary duty. He rejected Valley's reliance upon the frivolous litigation statute, N.J.S.A. 2A:15-59.1, and Rule 1:4-8 because the sisters prevailed on their claim and "frivolous litigation theories were not appropriate to examine . . . the basis of each claim to determine whether a particular claim was continued in good faith and not to harass a party in light of defendants' success." Addressing the sisters' claim, Judge Hansbury relied upon his and the summary judgment motion judge's finding that Valley did not act in bad faith, and therefore the sisters did not "fit one of the exceptions" to the "American Rule which requires each party to pay its own counsel fees."

The judge turned to Valley's entitlement to income and corpus commissions for the period from November 1, 2010 to July 26, 2016 and rejected the claim. The judge observed that "no management of the trust took place after Enid's death," citing to N.J.S.A. 3B:17-3's requirement for the timely completion of an accounting, the inexplicable delay in Valley completing it by November 1, 2010, and N.J.S.A. 3B:31-71 and N.J.S.A. 3B:31-84 for authority to reduce compensation due to a trustee "as a remedy for breach

of trust."  Finally, the judge addressed claims arising from Valley not investing the trust corpus after November 30, 2011 and noted, as he had in response to Valley's motion in limine, that there was "[in]sufficient evidence" presented about the claim as it had not been "prosecuted."

Deborah filed a motion for reconsideration that Judge Hansbury denied on October 21, 2016.  In his written decision, the judge considered the applicable law, explained errors in Deborah's arguments regarding the effect of the summary judgment motion judge's order and his own order regarding commissions, and contrary to Deborah's arguments, that he had properly accounted for tax consequences in his calculation of damages.  On the same date, the judge signed an order discharging Valley as trustee and approved the final accounting.  This appeal followed.

Our review of a trial court's fact-finding in a non-jury case is limited.  Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011).  "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence.  Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility."  Ibid. (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)).  The trial court enjoys the benefit, which we do not, of observing the parties' conduct and demeanor in the courtroom

21

and in testifying. <u>Ibid.</u> Through this process, trial judges develop a feel of the case and are in the best position to make credibility assessments. <u>Ibid.</u> We will defer to those credibility assessments unless they are manifestly unsupported by the record. <u>Leimgruber v. Claridge Assoc.</u>, 73 N.J. 450, 456 (1977) (citing <u>Fagliarone v. Twp. of N. Bergen</u>, 78 N.J. Super. 154, 155 (App. Div. 1963)). However, we owe no deference to a trial court's interpretation of the law, and review issues of law de novo. <u>Mountain Hill, LLC v. Twp. Comm. of Middletown</u>, 403 N.J. Super. 146, 193 (App. Div. 2008).

On appeal, Valley first argues that Judge Hansbury did not satisfy his obligation "to find the facts and state [his] conclusions of law" under <u>Rule</u> 1:7-4 because his decision was not based on facts in the record and his conclusions of law were inadequate. Although couched in terms of the <u>Rule</u>, Valley's argument is in actuality that the judge "ignored salient facts in his finding of facts and issued patently erroneous conclusions of law." We disagree. As discussed infra, we conclude that Judge Hansbury's decision clearly set forth his reasons, was supported by substantial evidence in the record, and was legally correct.

We turn to Valley's contention that Judge Hansbury misapplied the PIA by holding that the retention provision of the trust agreement took precedence over the PIA's mandate for a trustee to

22

diversify. We reject that contention and conclude the judge correctly applied the statute.

The PIA mandates the diversification of investments. It states that "[a] fiduciary shall diversify the investments of the trust unless the fiduciary reasonably determines that, because of special circumstances, the purposes of the trust are better served without diversifying." N.J.S.A. 3B:20-11.4. Even outside of the PIA, "[d]iversification is a uniformally recognized characteristic of prudent investment and, in the absence of specific authorization to do otherwise, a trustee's lack of diversification would constitute a breach of its fiduciary obligations." Robertson v. Cent. Jersey Bank & Trust Co., 47 F.3d 1268, 1274 n.4. (3rd Cir. 1995).

However, the PIA recognizes that despite the mandate, the grantor's intent controls and, if there is any doubt as to that intent, application should be made to the court. It states:

> The prudent investor rule is a default rule that may be expanded, restricted, eliminated, or otherwise altered by express provisions of the trust instrument. A fiduciary is not liable to a beneficiary to the extent that the fiduciary acted in reasonable reliance on those express provisions. Nothing herein shall affect the jurisdiction of the Superior Court to order or authorize a fiduciary to deviate from the express terms or provisions of a trust instrument for the causes, in the manner, and to the extent otherwise provided by law.

[N.J.S.A. 3B:20-11.2(b).]

Applying to Ray's trust agreement the PIA and well settled requirements for ascertaining a trust's settlor's intent, see In re Trust of Duke, 305 N.J. Super. 408, 418 (Ch. Div. 1995), aff'd, 305 N.J. Super. 407 (App. Div. 1997), it is beyond cavil that he directed Peoples, as trustee, to retain the stock he deposited and specifically insulated his trustee from liability against any claim being raised if it failed to diversify. The provision did not make retention optional. Compare Robertson, 47 F.3d at 1271 (where the trust instrument authorized but did not require the trustee to "retain, temporarily or permanently, any or all of the stock"); Americans for the Arts v. Ruth Lilly Charitable Remainder Annuity Trust #1, 855 N.E.2d 592, 595 (Ind. Ct. of App. 2006) (where the trust instrument stated "any investment made or retained by the trustee in good faith shall be proper despite any resulting risk or lack of diversification").

Moreover, to the extent Valley believed that despite the retention provision, it would be better to diversify, it was obligated to seek authorization from the court before selling the trust's corpus. N.J.S.A. 3B:20-11.2(b); Matter of Wold, 310 N.J. Super. 382, 387 (Ch. Div. 1998); see also Restatement (Second) of Trusts § 167(1) (1959) (stating that a court will deviate from the

express terms of the trust instrument "if owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair" the purpose of the trust). Notably, Valley's counsel explained these options to his client, but Valley chose to act at its own peril despite counsel's advice. Under these circumstances, we have no reason to question Judge Hansbury's legal conclusion regarding the impact of the PIA and Valley's obligation to retain the stock in Ray's trust.

We similarly agree with Judge Hansbury's rejection of Valley's related argument that the sisters' claims were barred by the doctrine of laches, equitable estoppel, avoidable consequences, or ratification because they had obtained sufficient knowledge by January 2001 when the 2000 statement reflecting its diversification was sent to Enid, and did not object to it for over a decade. We conclude Valley's arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We only observe that Judge Hansbury found that the sisters should have known about the retention provision in May 2008 and his finding was based on credible evidence presented at the trial. Moreover, his decision to reject defenses asserted by Valley were legally correct as they are "not regarded with favor where the parties stand in a confidential relation[ship,]" Weisberg v. Koprowki, 17 N.J. 362, 378 (1955), and where a party's

actions have contributed to or caused the delay, its equitable claims will not be sustained. See Rolnick v. Rolnick, 262 N.J. Super. 343, 364 (App. Div. 1993).

Valley also contends that the passive changes to the trust's stocks that occurred as a result of the AT&T "spin offs" and the merger of Exxon and Mobile voided the retention provision. We disagree and again conclude that Valley's contentions on appeal are without merit. We agree with Judge Hansbury's finding that there was absolutely no evidence that the stocks that resulted from the spinoffs or the merger were substantially different than the original stocks deposited by Ray into the trust. "[N]ew stock [issued] as a result of a merger, reorganization or other cause" is treated as the same stock as the old "if the new stock is the equivalent or substantially the equivalent of the old." Fidelity Union Trust Co. v. Cory, 9 N.J. Super. 308, 312 (Ch. Div. 1950); see also Restatement (Second) of Trusts § 231 cmt. f (1959). The new shares are considered substantially equivalent to the original shares in companies if the resulting companies are conducting business that is of the same nature as the original companies. See Fidelity, 9 N.J. Super. at 313; In re Estate of Riker, 124 N.J. Eq. 228, 231-32 (Prerog. Ct. 1938), aff'd o.b., 125 N.J. Eq. 349 (E. & A. 1939). There was no evidence that the Bell stocks

or ExxonMobile represented any substantial change in the nature of the portfolio.

Contrary to Valley's contention that Judge Hansbury should have taken judicial notice under N.J.R.E. 201 of the fact that the "[n]ew [c]ompanies were wholly unrelated" to their predecessors, that fact, even if judicially noticeable, did not satisfy Valley's burden to demonstrate a substantial change in the stocks subject to the retention clause. That evidence, as Valley points out in its discussion of Mertz v. Guaranty Trust Co. of N.Y., 247 N.Y. 137, 139-4 (N.Y. 1928), must establish that the "identity and substance" of the original shares were "destroyed." Here, there was no such evidence.

Next, we address Valley's contention that even if it breached its fiduciary duty to the sisters, it did so in good faith and should, therefore, be excused from paying any damages under the "innocuous breach" doctrine. The doctrine is an exception to the general rule that a trustee shall be held liable for a loss it causes by failing to adhere to the trust instrument without judicial sanction, even if it acts in good faith. See Conover v. Guarantee Trust Co., 88 N.J. Eq. 450, 458 (Ch. 1917), aff'd o.b., 89 N.J. Eq. 584 (E. & A. 1918). A court can invoke the doctrine "[i]f [it] concludes that . . . it would be unfair or unduly harsh to require the trustee to pay, or pay in full . . . ." Restatement

(Third) of Trusts § 95 cmt. d (Am. Law Inst. 2012). "Ordinarily, such relief would be based on a finding that the trustee had made a conscientious effort to understand and comply with applicable fiduciary standards and the duties of the trusteeship." Ibid. When determining whether to relieve the trustee of liability, a court must consider "whether the trustee was aware of the availability (in an appropriate situation) of court instruction . . . and, if so, the reasons for the trustee's decision not to seek instruction." Ibid.

Applying these guiding principles here, we conclude there was ample evidence in the record to establish that Valley was aware from its counsel's advice about the wisdom of seeking the beneficiaries' or the court's approval before deviating from the retention provision. Yet, there was no evidence explaining why Valley chose to ignore that advice. Under these circumstances, we see no reason for the application of the doctrine either to relieve Valley from liability for damages, or, as Valley also argued, for pre-judgment interest.

We also disagree with Valley's contention that Judge Hansbury improperly denied it additional corpus commissions for the period from November 2010 through July 2016. In support of its argument, Valley relies upon In re Armour's Will, 61 N.J. Super. 50, 57 (App. Div.), rev'd on other grounds, 33 N.J. 517 (1960), a case

28                                           A-0929-16T1

that addressed commissions on income, not corpus commissions. We find its reliance inapposite. There, in reversing our decision to approve an executor/trustee receiving double income commissions based on its dual capacity, the Supreme Court stated that in determining entitlement to commissions, a court should look to the service performed. It stated that commissions should be paid when a trustee "h[e]ld, manage[d] and invest[ed] . . . assets and pa[id] over the income thereon as well as the principal to the specified beneficiary." In re Armour's Will, 33 N.J. 517, 524 (1960). In denying commissions here, Judge Hansbury did just that when he determined Valley was not entitled to such commissions because it was "clear that no management of the trust took place after Enid's death." Moreover, N.J.S.A. 3B:31-71(b)(8) permitted the judge to deny compensation to Valley for its "breach of trust." There was no error in denying the commissions.

We next address Valley's challenge to Judge Hansbury's finding that May 2, 2008 was the proper date for valuation of the trust for the purpose of calculating damages. We review the determinations for an abuse of discretion, see Musto v. Vidas, 333 N.J. Super. 52, 64 (App. Div. 2000), and find none.

Here, Judge Hansbury rejected Valley's contention that the proper date should have been as early as 2000, when Valley began to diversify and its actions were disclosed in statements sent to

Enid and later to Deborah. In his oral decision, Judge Hansbury explained why the earlier date was not appropriate and why he relied upon the May 2008 date. The judge's findings were supported by the record and his determination of the date was consistent with principles of fairness and justice. Graziano v. Grant, 326 N.J. Super. 328, 342 (App. Div. 1999).

In sum, as to Valley's contentions, we conclude neither the PIA nor any of the sisters' actions, as argued by Valley, warrant our interference with the outcome in this matter as to Valley's liability or the damages assessed against it by the judge. To the extent we have not specifically addressed any of Valley's remaining arguments, we find them to be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Turning to the cross-appeals filed by the sisters, we begin by rejecting their argument that the stock portfolio's valuation date should have been the date of the judge's final "decree" for the same reason we rejected Valley's contention about an earlier date being used. We find the sisters' reliance on the opinion in the New York case of In the Estate of Rothko, 401 N.Y.S.2d 449, 455-56 (N.Y. 1977), to be inapposite. In that case, the court held an executor, who ignored a testamentary direction that certain paintings be retained, liable for the value of paintings he sold as of the date of judgment to account for "appreciation damages"

30                                              A-0929-16T1

between the date of sale and the date of judgment. Here, as to the stock portfolio, the judge's use of the May 2008 date and his award of pre-judgment interest fully compensated Deborah and Sarah for their loss, including any rise in the portfolio's value had the stocks been retained. We are satisfied the court's award properly compensated them for loss of money that rightfully should have been turned over to them upon Enid's death, after taking into consideration their failure to take action for a period of four years after they learned of Valley's breach. Penpac, Inc. v. Passaic Cty. Util. Auth., 367 N.J. Super. 487, 504 (App. Div. 2004). Their contentions to the contrary are without any merit.

We turn next to Sarah's argument that all or part of the commissions Judge Hansbury and the summary judgment motion judge awarded to Valley should be reversed because Valley violated the retention provision and performed in a materially deficient manner. Sarah claims that Valley was not entitled to corpus commissions under N.J.S.A. 3B:18-14 based upon Ray's fee agreement with Peoples, as well as Peoples choosing to not take such commissions.

In granting summary judgment to Valley on the question of corpus commissions, the motion judge stated that Valley was "entitled to its corpus commissions, because in the absence of any expressed commission, N.J.S.A. 3B:18-2 clearly provides that those

commissions be allowed." With respect to income commissions, he held that Valley was bound by the five percent commission set forth in the fee agreement. Later, in response to Valley's motion in limine to exclude evidence regarding the corpus commissions, Judge Hansbury granted the motion relying upon the motion judge's determination with which Judge Hansbury independently agreed. Ultimately, Judge Hansbury awarded Valley corpus commissions from August 13, 1993 to May 2, 2008, totaling $80,181, after concluding that Valley did not do anything "willfully wrong." We agree with both judges.

"The allowance of corpus commissions is a discretionary determination which will not be disturbed unless there has been an abuse of discretion[,]" or "the court did not utilize 'the proper legal approach[.]'" In re Estate of Summerlyn, 327 N.J. Super. 269, 272 (App. Div. 2000).

N.J.S.A. 3B:18-2 provides:

> On the settlement of the account of a nontestamentary trustee, as defined in N.J.S.A. 3B:17-9, the court shall allow him the compensation as may have been agreed upon by the instrument creating the trust; and in the absence of any express provision concerning compensation, shall allow him commissions in accordance with this chapter.
>
> [(Emphasis added).]

Here, it was undisputed that the fee agreement between Ray and Peoples was silent about the trustee's entitlement to a corpus commission and there was no agreement with Valley. Both judges properly applied the statute and permitted Valley to recover those commissions. Valley's entitlement to a corpus commission was not altered by Peoples' earlier decision to forgo payment of those commissions because Valley as successor trustee was not bound by Peoples' decision. See, e.g., In re Loree's Trust Estate, 24 N.J. Super. 604, 607 (Ch. Div. 1953) (noting that a court must allow compensation to a successor trustee where there are no express terms regarding compensation, entitling successor trustee to the commissions set forth by statute).

Finally, the sisters argue that even if Valley was entitled to claim a commission, its request should have been denied or at least reduced, due to its "materially deficient performance," N.J.S.A. 3B:18-14,[8] including violation of the retention clause,

---

[8]  The statute states in relevant part:

> Such commissions may be reduced by the court having jurisdiction over the estate only upon application by a beneficiary adversely affected upon an affirmative showing that the services rendered were materially deficient or that the actual pains, trouble and risk of the fiduciary in settling the estate were substantially less than generally required for estates of comparable size.

filing improper capital gains tax returns, and holding money un-invested in a bank account. We find this contention to be without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E). We only observe that there was no finding that while Valley acted as trustee it performed in a materially deficient manner. Cf. In re Will of Landsman, 319 N.J. Super. 252, 275 (App. Div. 1999) (undue influence banned executor from receiving commissions). To the extent it failed to honor the retention clause, Judge Hansbury adjusted Valley's compensation and awarded damages against it for its breach.

Contrary's to Deborah's next argument, we also discern no abuse of the judge's discretion, see Magnet Res., Inc. v. Summit MRI, Inc., 318 N.J. Super. 275, 297 (App. Div. 1998), in not permitting the sisters to present evidence at the damages trial related to Valley's failure to invest the money it held in its Cash Management Fund. "The evidence [they sought to introduce] obviously was not newly discovered" and "had been in the hands of the" sisters prior to the liability trial, but they did not present it when given the opportunity. Henry Clay v. City of Jersey City, 84 N.J. Super. 9, 18 (App. Div. 1964). Under these circumstances, Judge Hansbury properly ruled it was too late.

---

[N.J.S.A 3B:18-14].

A-0929-16T1

Deborah also challenges the summary judgment motion judge's determination that the sisters' claim about Valley negligently utilizing a cost basis, rather than stepped-up basis, in its capital gains tax filings was not cognizable in the probate litigation. We conclude that while Deborah correctly states the claim was cognizable because it related to a breach of the fiduciary's duty, see In re Estate of Lash, 169 N.J. 20, 27 (2001); F.G. v. MacDonell, 150 N.J. 550, 564 (1997), the motion judge's error was harmless. R. 2: 10-2. We are satisfied that[9] because the sisters were able to cross examine Grudelski during the liability trial about Valley's choice of basis as part of their breach of fiduciary duty claim, they suffered no prejudice as a

---

[9]   In granting Valley summary judgment on the negligence counterclaim, the summary judgment motion judge stated that "compensatory damage-type award[s]," such as negligence, are usually not permitted in a Probate Part proceeding. Rather, such claims are encompassed in breach of fiduciary duty claims. Valley's "liability, if any, will be based on a breach of fiduciary duty and/or implied covenant of good faith and fair dealing, not on a theory of negligence or conversion." As noted earlier, breach of fiduciary duty is a tort theory. Lash, 169 N.J. at 27. As a result, a fiduciary may be held liable for harm resulting from a breach of the duties imposed by the fiduciary relationship, and damages may be awarded as a result of that breach. Ibid.; F.G., 150 N.J. at 564. Therefore, the summary judgment judge was in error by concluding that a negligence claim and a breach of fiduciary claim were unrelated theories of recovery, and by dismissing defendants' negligence claim, in which they sought to recover for the payment of unnecessary capital gains tax, on summary judgment on that basis.

result of the judge's error, especially in light of the sisters' success on that claim.

Deborah also maintains that Judge Hansbury erred by accepting Gould's use of the trust's actual 2008 tax payments in determining the estimated taxes for that year in the hypothetical describing the result had the stock been retained. She claims that the damages award should be increased by $8024 to account for Gould's error. We disagree.

Gould included $9606 in his hypothetical as the estimated taxes that the trustee paid in April 2008. He used it as an estimate of income tax that would have been due on interest and dividends received by the trust had the stocks been retained.[10] Judge Hansbury, as the factfinder, was free to accept or reject Gould's expert testimony, in whole or part. See Torres v. Schripps, Inc., 342 N.J. Super. 419, 430-31 (App. Div. 2001); City of Long Branch v. Liu, 203 N.J. 464, 491 (2010). Moreover, we discern no error, as argued by Deborah, in Gould's accounting for the 2008 taxes actually paid on the sale of stock in his estimate.

---

[10] The fact that the amount coincided with the capital gains tax on the early 2008 sale of Comcast and Exxon shares did not constitute double counting since Gould was using the figure as an estimate of taxes due on the interest and dividends received by the trust in the hypothetical scenario where the stock had been retained in the trust.

Finally, Deborah contends that Valley should reimburse Sarah's counsel fees, an argument not raised by Sarah in her cross-appeal. She argues that Valley's failure to adhere to the retention provision and its failure to follow its attorney's advice established the bad faith that Judge Hansbury refused to find when he denied the sisters' fee application. We disagree.

The decision whether to award counsel fees rests within the sound discretion of the trial court. Maudsley v. State, 357 N.J. Super. 560, 590 (App. Div. 2003). When exercising that discretion, courts must be cognizant of New Jersey's strong public policy against the shifting of counsel fees and our adherence to the "American Rule," which prohibits recovery of counsel fees by the prevailing party against the losing party, In re Niles Trust, 176 N.J. 282, 293-94 (2003), unless authorized by statute or rule. See Rule 4:42-9; In re Estate of Vayda, 184 N.J. 115, 120 (2005). "[L]imited exceptions" have been created in the interest of equity in those instances involving claims against an attorney, or when an executor or trustee have acted in bad faith such as by acting in self-interest or committing "the pernicious tort of undue influence." Id. at 122-23; Niles, 176 N.J. at 298; see also In re Estate of Stockdale, 196 N.J. 275, 308 (2008) (the tort of undue influence is available where breach of fiduciary would be inadequate).

37

Judge Hansbury properly determined that Valley did nothing to promote its self-interest by diversifying, and acted in what it believed was the beneficiaries' best interests. We conclude therefore that he properly denied the sisters' fee application and we reject Deborah's arguments to the contrary.

In sum, despite the sisters' arguments to the contrary, we conclude that all of Judge Hansbury's determinations were supported by credible evidence and legally correct. To the extent that the summary motion judge erred, we find no harmful error. Finally, to the extent we have not specifically addressed any of their remaining arguments, we find them to also be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION